**John COCKRUM, By Next Friend Mandy WELCH, Applicant,**

v.

**Gary JOHNSON, Director, Texas Department of Criminal Justice, Institutional Division, Respondent.**

No. 6:93 cv 230.

United States District Court,
E.D. Texas,
Tyler Division.

July 25, 1996.

John Cockrum, Huntsville, TX, pro se.

Mandy Welch, Texas Defender Service, Houston, TX, Richard H. Burr, Houston, TX, for John Cockrum.

Stephani A. Stelmach, John Jacks, Asst. Attys. Gen., Meredith Anne Martinez, Attorney General's Office, Criminal Law Enforcement, Division LEDD, Austin, TX, for James A. Collins.

### MEMORANDUM OPINION

JUSTICE, District Judge.

## I. Introduction

John Cockrum, through his next friend Mandy Welch, Esq., brings the above-entitled and numbered application seeking the writ of habeas corpus. After reviewing the evidence and arguments of the parties, it is found, pursuant to the following findings of fact and conclusions of law, that the application should be granted in part and denied in part and that a writ of habeas corpus should conditionally issue.

## II. Factual and Procedural Background

In May 1986, in DeKalb, Texas, John Cockrum shot and killed Eva May, during the course of a robbery of the small convenience store that she owned and operated. Cockrum was arrested along with his accomplice, Jerry Morgan, and indicted for capital

murder by a Bowie County grand jury.[1] After trial in December 1986, a jury found Cockrum guilty of intentionally causing the death of another in the course of aggravated robbery, and affirmatively answered all special issues, as required by former Tex.Code Crim.P. art. 37.071. In accordance with the jury's findings, Cockrum was convicted of capital murder and sentenced to death by lethal injection. The Texas Court of Criminal Appeals affirmed his conviction and sentence on direct appeal, and the United States Supreme Court denied Cockrum's petition for the writ of certiorari. *Cockrum v. State,* 758 S.W.2d 577 (Tex.Crim.App.1988), *cert. denied,* 489 U.S. 1072, 109 S.Ct. 1358, 103 L.Ed.2d 825 (1989).

Cockrum filed an application for the writ of habeas corpus in Texas state court, before the same judge who sat at Cockrum's trial. Without an evidentiary hearing, the state district court entered findings of fact and conclusions of law, which the Texas Court of Criminal Appeals found to be supported by the record. In a *per curiam* opinion, the Court of Criminal Appeals denied the habeas corpus application. *Ex parte Cockrum,* No. 23,249-02 (Tex.Crim.App.1992).

In 1993, Cockrum applied for the writ of habeas corpus in federal court, and his execution was stayed pending review of the application. Since its filing, this action has proceeded along a tortuous path, requiring, among other things, the determination of the applicant's competency to waive further review of his conviction and sentence, *In re Cockrum,* 867 F.Supp. 484 (E.D.Tex.1994), the substitution of counsel for the applicant, and the resolution of discovery disputes, *Cockrum v. Johnson,* 917 F.Supp. 479 (E.D.Tex.1996). In February 1996, a hearing on the merits of Cockrum's application was finally held.

On April 24, 1996, the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub.L. 104-132, 110 Stat. 1217, was signed into law, and a new issue was injected into this action—whether the newly enacted law applies to Cockrum's application and if it

does, what it means. The State argues that Cockrum's application must be evaluated under the newly amended provisions of 28 U.S.C. § 2254, and that under these provisions, all relief to the applicant must be denied. Cockrum, on the other hand, contends that the AEDPA does not retroactively apply to pending cases, and that, contrary to the State's interpretation, he is entitled to the writ even under the newly amended provisions. The parties have fully briefed all issues, including the impact of the new law, and all claims for relief in the application are now ripe for adjudication.

This opinion proceeds in four parts. First, the retrospective effect of the new law is considered, and it is determined that the newly enacted amendments to the habeas corpus statute do not apply to this case, but that the uncertain state of the law justifies analyzing Cockrum's application, in the alternative, under the AEDPA. Second, the applicant's challenge to the presumption of correctness of the state habeas court's fact-findings is addressed, and it is found that the presumption should not attach. Third, the merits of Cockrum's claims are considered, and it is concluded that because Cockrum received ineffective assistance in the punishment phase of his trial, the writ of habeas corpus should conditionally issue. Finally, Cockrum's application is analyzed, in the alternative, under the AEDPA, and it is likewise determined that Cockrum is entitled to the writ of habeas corpus due to the ineffective assistance of counsel.

## III. *Effect of Antiterrorism and Effective Death Penalty Act*

Title I of the AEDPA significantly curtails the scope of federal habeas review. The law amends chapter 153 of United States Code title 28, by creating stricter filing deadlines for habeas corpus applications, narrowing the circumstances in which an appeal may be taken, altering the standards by which a federal court reviews an applicant's claims, and restricting the ability of a prisoner to bring more than one application for relief.

---

1. The events leading to Cockrum's arrest are recounted in *Cockrum v. State,* 758 S.W.2d 577, 579–81 (Tex.Crim.App.1988).

AEDPA §§ 101–106 (to be codified at 28 U.S.C. §§ 2244, 2253, 2254 & 2255). The AEDPA also creates a new chapter—title 28, chapter 154—establishing procedures that apply only to prisoners in state custody under a death sentence. AEDPA § 107 (to be codified at 28 U.S.C. §§ 2261–2266).

At issue here is § 104, the amendments to 28 U.S.C. § 2254. The State does not argue that § 107, the new chapter governing death penalty cases, applies to this action, despite the fact that Cockrum is a prisoner in state custody under a death sentence. This is so because the applicability of the new death penalty chapter is predicated on the adoption of a mechanism for the appointment and payment of counsel in state post-conviction proceedings. AEDPA § 107(a) (to be codified at 28 U.S.C. § 2261). No such mechanism was in place when Cockrum's habeas corpus application was considered by the Texas state system. Thus, § 107 does not apply to this action, and is relevant here only to the extent it sheds light on the retrospective effect of § 104.

 *Landgraf v. USI Film Products,* 511 U.S. 244, 114 S.Ct. 1483, 128 L.Ed.2d 229 (1994), provides the framework for determining the initial question of whether the AEDPA applies to pending cases on its date of enactment. First, "where the congressional intent is clear, it governs"; if the statute evinces a clear intent for prospectivity or retroactivity, there is no need to analyze the issue further. *Id.* at ——, 114 S.Ct. at 1496 (quoting *Kaiser Aluminum & Chem. Corp. v. Bonjorno,* 494 U.S. 827, 837, 110 S.Ct. 1570, 1577, 108 L.Ed.2d 842 (1990)). If congressional intent is ambiguous, however, then it must be determined whether the statute has "retroactive effect, *i.e.,* whether it would impair rights a party possessed when he acted, increase a party's liability for past conduct, or impose new duties with respect to transactions already completed." *Id.* at ——, 114 S.Ct. at 1505. If the statute would operate retroactively in this manner, then it does not apply to pending cases. If the new law does not have retroactive effect—*i.e.,* it is a rule of procedure, or a jurisdictional statute changing the tribunal to hear the case, or a law altering the standard for granting purely

prospective relief—then the new statute does apply to pending cases. Reviewing the AEDPA under the first part of the *Landgraf* test, it is concluded that Congress did not intend § 104 of the AEDPA to apply to actions pending on the date of its enactment, and thus, it is unnecessary to consider, under the second part of the *Landgraf* test, whether the law would have retroactive effect.

In drafting § 107, Congress stated explicitly that the new death-penalty chapter applies retroactively: "Chapter 154 of title 28, United States Code ... shall apply to cases pending on or after the date of enactment of this Act." AEDPA, § 107(c). In contrast, the amendments to Chapter 153, including § 104, lack any provision specifying whether they are prospective or retroactive. ."[W]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." *Gozlon–Peretz v. United States,* 498 U.S. 395, 404, 111 S.Ct. 840, 847, 112 L.Ed.2d 919 (1991) (quoting *Russello v. United States,* 464 U.S. 16, 23, 104 S.Ct. 296, 300, 78 L.Ed.2d 17 (1983)) (internal quotation marks omitted). Applying this maxim to the AEDPA, it is found that because § 107 contains an explicitly retroactive provision, and because § 104 contains no retroactive provision, Congress intended the latter to have only prospective effect. Accordingly, because Cockrum's application was pending on the date that the AEDPA was signed into law, it is found that § 104 does not apply to this action.

It is recognized that the Supreme Court in *Landgraf,* applying the same canon of statutory construction, found a similar, although much weaker, argument to be insufficient to establish congressional intent on the subject of a statute's retroactivity. *See Landgraf,* 511 U.S. at ——–—— & —— n. 12, 114 S.Ct. at 1494–95 & 1495 n. 12 (holding that two minor, expressly prospective, provisions of the Civil Rights Act of 1991, 42 U.S.C. § 1981a, do not support a negative inference that the rest of the law should be applied retroactively). It is also recognized that the courts that have addressed the issue of the

AEDPA's effect on pending cases have not all reached the same conclusion as is reached in this case. Indeed, it is difficult to find any points of agreement at all among the many recent decisions on this difficult and important question. Some have found, as it is found here, that the AEDPA does not apply to pending cases because that is what Congress intended. *See United States v. Trevino,* No. 96 C 828, 1996 WL 252570, *3 n. 1 (N.D.Ill. May 10, 1996); *Warner v. United States,* 926 F.Supp. 1387, 1390 n. 4 (E.D.Ark. 1996); *see also Edens v. Hannigan,* 87 F.3d 1109, 1111 (10th Cir.1996). At least one court, however, has found congressional intent to be the opposite, *i.e.,* that the AEDPA should apply retroactively. *Leavitt v. Arave,* 927 F.Supp. 394, 397 (D.Idaho 1996). Several courts have reached a third conclusion— that congressional intent is ambiguous; however, even those opinions that have applied the second part of the *Landgraf* test have not reached consistent conclusions. *Compare Lennox v. Evans,* 87 F.3d 431, 432–35 (10th Cir.1996) (holding that the AEDPA's amendments to 28 U.S.C. § 2253(c)(2) have no retroactive effect) *with Boria v. Keane,* 90 F.3d 36, 38 (2d Cir.1996) (per curiam) ("[A]pplication of the new statute to this case would be retroactive.") *and Trevino,* 1996 WL 252570, *3 n. 1 (holding that the AEDPA has a "truly retroactive effect"). In the Fifth Circuit, the retroactivity of the new habeas provisions remains an open question. *Callins v. Johnson,* 89 F.3d 210, 216 (5th Cir. 1996); *Mendez–Rosas v. INS,* 87 F.3d 672, 676 (5th Cir.1996) (per curiam). In light of this uncertainty, it would be imprudent to fail to consider the AEDPA altogether in this opinion. Thus, Cockrum's claims will be analyzed first under pre-AEDPA law, and second, in the alternative, his claims will be evaluated under the AEDPA.

## IV. Presumption of Correctness of State Factfindings

■ Cockrum challenges the presumption of correctness ordinarily afforded a state court's findings of fact in a federal habeas corpus proceeding.[2] 28 U.S.C. § 2254(d). Although Cockrum relies on a number of § 2254(d)'s eight enumerated exceptions, he generally alleges that the presumption should not attach because the factfinding process was inadequate.[3] *See Andrews v. Collins,* 21 F.3d 612, 618 (5th Cir.1994), *cert. denied,* —— U.S. ——, 115 S.Ct. 908, 130 L.Ed.2d 790 (1995); *Black v. Collins,* 962 F.2d 394, 400 (5th Cir.1992), *cert. denied,* 504 U.S. 992, 112 S.Ct. 2983, 119 L.Ed.2d 601 (1992) (both treating challenges under multiple statutory exceptions as a general challenge to the adequacy of the factfinding procedures employed by the state court). Specifically, Cockrum contends that he did not receive a full and fair hearing because a live, evidentiary hearing was not held and because the state judge and prosecutor engaged in *ex parte* communications.[4]

### A. Adequacy of Paper Hearing

In February 1992, Cockrum filed his petition in state court, along with a motion for discovery and a motion for an evidentiary

**2.** In a previous order, it was determined that the threshold requirements had been met in order for the presumption to attach, but that an evidentiary hearing was necessary to resolve fact issues surrounding the applicability of the statutory exceptions to the presumption. *See Memorandum Opinion and Order,* Nov. 15, 1995, at 4–7.

**3.** Cockrum relies on the following exceptions in challenging the adequacy of the state court's factfinding procedure:

(2) that the factfinding procedure employed by the State court was not adequate to afford a full and fair hearing;
(3) that the material facts were not adequately developed at the State court hearing;
. . . .

(6) that the applicant did not receive a full, fair, and adequate hearing in the State court proceeding; or
(7) that the applicant was otherwise denied due process of law in the State court proceeding.

28 U.S.C. § 2254(d). Also, Cockrum at one time maintained that certain factfindings lacked fair support in the record, *id.* § 2254(d)(8); *Petitioner's Reply to Respondent Scott's Answer, Motion for Summary Judgment, and Supporting Brief,* at 14–16; however, because the claims to which these facts relate have since been abandoned, it is unnecessary to address this contention.

**4.** Cockrum's additional argument that the state court's factfinding procedures were inadequate because he could not conduct discovery is without merit. *Andrews,* 21 F.3d at 618–19.

hearing. After several extensions were granted, the State filed its response on August 18, 1992. Eight days later, on August 26, 1992, the trial judge, without ruling on the motion for discovery or the motion for an evidentiary hearing, signed findings of fact and conclusions of law. In a *per curiam* order, the Texas Court of Criminal Appeals denied the petition on December 14, 1992.

Faced with widely divergent factual allegations and with affidavits attesting to contradictory versions of events, the state habeas court resolved all factual disputes against Cockrum without hearing any testimony. In *Buxton v. Lynaugh*, 879 F.2d 140, 142–47 (5th Cir.1989), *cert. denied*, 497 U.S. 1032, 110 S.Ct. 3295, 111 L.Ed.2d 803 (1990), it was held that such a procedure is "full and fair" within the meaning of § 2254(d), as long as the state habeas judge was the same judge who presided at trial. That is the case here—the state judge that conducted Cockrum's trial also heard his petition for habeas relief.

 As the Fifth Circuit has explained, the reason that a "paper hearing" can be adequate in such a case is that the trial judge is "in an optimal position to assess the credibility of the affidavits" before it. *May v. Collins*, 955 F.2d 299, 314 (5th Cir.), *cert. denied*, 504 U.S. 901, 112 S.Ct. 1925, 118 L.Ed.2d 533 (1992). When a state judge must "choos[e] between competing versions of the actual events at trial ..., he [can] compare the information presented in the various affidavits against his own firsthand knowledge of the trial." *Id.* In such a situation, live testimony is not necessary, and the federal court should generally accord a presumption of correctness to the state judge's conclusions. Consistent with this rationale, the Fifth Circuit has upheld "paper hearing" determinations of ineffective assistance claims, on the theory that the state habeas judge had an opportunity to observe the conduct of defense counsel at trial. *E.g., Sawyers v. Collins*, 986 F.2d 1493, 1504–05 (5th Cir.), *cert. denied*, 508 U.S. 933, 113 S.Ct. 2405, 124 L.Ed.2d 300 (1993); *Clark v. Collins*, 956 F.2d 68, 72 (5th Cir.), *cert. denied*, 503 U.S. 901, 112 S.Ct. 1254, 117 L.Ed.2d 485 (1992). Similarly, when an ap-

plicant alleges that testimony given at trial was false, the trial judge's firsthand observations of the witness on the stand provide a legitimate basis for rejecting the witness's recanting affidavit. *E.g., Ellis v. Collins*, 956 F.2d 76, 79–80 (5th Cir.) (per curiam), *cert. denied*, 503 U.S. 915, 112 S.Ct. 1285, 117 L.Ed.2d 510 (1992); *May*, 955 F.2d at 314.

While acknowledging this general rule, Cockrum argues that a paper hearing was insufficient in this case to resolve the factual dispute underlying his claim that the State misrepresented the terms of a key witness's plea bargain. Factually, this claim alleges that the prosecution struck a deal with Jerry Morgan, who was Cockrum's accomplice and the primary witness at Cockrum's trial, assuring Morgan of an early release on parole; and further, that this deal was improperly withheld from the jury. In support of these allegations, Cockrum submitted the affidavit of Jerry Morgan to the state habeas court, an affidavit which asserted that the prosecutor "promised me that I would be paroled as soon as I was eligible if I cooperated and provided the State with a statement." *Petition for Writ of Habeas Corpus*, No. 86–F–144–5, app. A, ¶ 5 (Affidavit of Jerry Morgan). With its response, the State submitted an affidavit from the prosecutor in question, as well as an affidavit from Morgan's defense attorney. These two affidavits, which are essentially identical, contradict Morgan: "The State did not agree to an early parole release date or promise early release on parole as part of the plea bargain agreement." *Response to Petitioner's Application for Writ of Habeas Corpus*, No. 86–F–144–5, Ex. B, ¶ 5 (Affidavit of Paul Hoover); *id.*, Ex. D, ¶ 5 (Affidavit of James Elliott). The state habeas court, which not only observed Morgan's testimony at Cockrum's trial, but also took Morgan's guilty plea, found that no deal regarding parole had been made, obviously crediting the State's affiants over Morgan. *See Findings of Fact and Conclusions of Law*, No. 86–F–144–5, ¶ 2 (5th Dist.Ct.Bowie County, Tex.1992) ("The plea bargain did not include an agreement for early release on parole.").

Cockrum argues that the rationale for the rule developed in *Buxton* and *May* depends

on the ability of the judge to draw on his observations at trial when assessing the pleadings and affidavits before him at the habeas stage. *Cf. Vuong v. Scott,* 62 F.3d 673, 684 (5th Cir.) ("[T]he fact that the judge has a personal recollection of the proceeding actually contributes to the adequacy of a paper hearing rather than detracting from it."), *cert. denied,* —— U.S. ——, 116 S.Ct. 557, 133 L.Ed.2d 458 (1995). When the applicant asserts facts that occur outside the courtroom, Cockrum points out, the trial judge is in no better position to rule on the issue at the habeas stage than a state judge who did not preside over the applicant's trial. *Cf. Nethery v. Collins,* 993 F.2d 1154, 1157 n. 8 (5th Cir.1993) (finding paper hearing inadequate when habeas judge different from trial judge), *cert. denied,* —— U.S. ——, 114 S.Ct. 1416, 128 L.Ed.2d 87 (1994). Without the judge's benefit of firsthand observation, Cockrum argues that the primary rationale for deferring to the "paper hearing" disappears, and an evidentiary hearing is necessary to resolve factual disputes, especially those raised by contradictory affidavits. Emphasizing that the adequacy of a paper hearing must be determined on a case-by-case basis, *May,* 955 F.2d at 312 ("[I]t is necessary to examine in each case whether a paper hearing is appropriate to the resolution of the factual disputes underlying the petitioner's claim."), Cockrum argues that in this case, the state judge had no satisfactory basis for resolving the factual dispute raised by the affidavits of the prosecutor and Morgan's attorney, on the one hand, and Morgan, on the other. Because the plea bargaining process occurred outside the courtroom, Cockrum contends that the state judge was not in a position to evaluate the credibility of the affiants on the point of whether a deal regarding parole had been struck.

While the general thrust of Cockrum's argument has merit, its application to the facts of this case is foreclosed by *Amos v. Scott,* 61 F.3d 333, 346–47 (5th Cir.), *cert. denied,* —— U.S. ——, 116 S.Ct. 557, 133 L.Ed.2d 458 (1995). The applicant in *Amos* asserted a claim nearly identical to Cockrum's—"that the State failed to disclose that it had reached an agreement with [the witness/accomplice] in exchange for his testimony and

failed to correct false testimony elicited from [the witness/accomplice]." *Id.* at 346. As with Cockrum, the state judge that presided over Amos's trial also presided over the state habeas proceedings. With his state habeas petition, Amos submitted an affidavit from the witness/accomplice asserting that a deal had been struck with the State, a deal which was not revealed to the jury at trial. *Id.* Without hearing testimony, the state habeas court found that no deal was made between the State and the witness/accomplice. In federal court, Amos argued that a paper hearing was inadequate to resolve this claim, and that therefore the presumption of correctness should not apply. The Fifth Circuit unequivocally rejected this argument:

> [A] factfinding procedure that involves credibility determinations and is based on a "paper hearing" affords the habeas petitioner a full and fair hearing when the state court judge who presided over the petitioner's trial conducts the habeas proceeding. *Whenever such a judicial identity exists, the presumption of correctness applies,* and a federal habeas court must accord the presumption of correctness to the factual findings.

> In the instant case, the disputed facts stem from state habeas credibility assessments that were made by the same state court judge who had presided over Amos' trial. We are satisfied, therefore, that the factfinding procedure followed by that judge afforded Amos a full and fair hearing.

*Id.* at 347 (footnote omitted) (emphasis added). Applying *Amos* to this case, it is concluded that the lack of a live, evidentiary hearing on the "parole promise" claim did not deprive Cockrum of a full and fair hearing.

**B. Ex Parte Communications**

■ Both the judge and the attorney representing the State of Texas at the state habeas level testified that they had several *ex parte* telephone conversations concerning Cockrum's petition. *Deposition of the Honorable Jack Carter,* Jan. 17, 1996, at 9; *Deposition of Winonia Griffin,* Jan. 18, 1996, at 9–10. The judge, without notifying Cockrum, initiated the first telephone call shortly

after the State filed its response. The judge discussed the merits of Cockrum's claims with the State's attorney, and asked her to submit proposed findings of fact and conclusions of law for his review. *Deposition of Winonia Griffin,* at 9–10. The State's attorney did so, but did not serve the document on Cockrum. *Id.* at 11–12. The judge called the State's attorney back, and either asked her to make modifications after further discussion of the merits, *Deposition of the Honorable Jack Carter,* at 11–12, 26, or simply told her to remove the word "Proposed" from the title "Proposed Findings of Fact and Conclusions of Law" and to resubmit the document for his signature, *Deposition of Winonia Griffin,* at 9. Once again, Cockrum was not notified of the conversation, nor was he given any opportunity to review the first or final draft. After the requested revisions were made, the document was sent to the judge, who signed it as his findings of fact and conclusions of law. Although these *ex parte* conversations were informal, the State was advocating its position on the merits of the petition. *Deposition of the Honorable Jack Carter,* at 20, 26–27.

█ Obviously, it is highly improper for the judge to entertain argument in this manner. It is important, however, to identify precisely why it is improper. Contrary to Cockrum's argument, the adoption of findings prepared by the State's attorney, and the concomitant deference to her research, is not objectionable, although it is certainly not laudable. *Nichols v. Scott,* 69 F.3d 1255, 1277 (5th Cir.1995), *cert. denied,* —— U.S. ——, 116 S.Ct. 2559, 135 L.Ed.2d 1076 (1996). What is improper is the fact that the document was solicited, submitted, and signed without any notice to Cockrum, *see Brown v. Dixon,* 891 F.2d 490, 495 n. 12 (4th Cir.1989) (although adopting a prosecutor's suggestions are not improper, "the impropriety arose from the judge's failure to notify defense counsel of his course"), *cert. denied,* 495 U.S. 953, 110 S.Ct. 2220, 109 L.Ed.2d 545 (1990), and that discussions concerning the substance of the petition occurred outside Cockrum's presence, without his knowledge or approval.

█ It is also important to stress that not all *ex parte* contacts between prosecutor and judge deprive a party of a fair hearing within the meaning of § 2254(d). For instance, the fact that a judge merely received a proposed order outside the presence of opposing counsel does not justify setting aside the presumption of correctness. *Campbell v. Wainwright,* 738 F.2d 1573, 1576 (11th Cir.1984), *cert. denied,* 475 U.S. 1126, 106. S.Ct. 1652, 90 L.Ed.2d 195 (1986). Similarly, an *ex parte* letter from prosecutor to judge, pointing out that a draft order fails to address certain claims for postconviction relief, can be said to be "innocuous and the nondisclosure [of the letter] harmless beyond a reasonable doubt." *Brown,* 891 F.2d at 495 (citations omitted). In determining whether *ex parte* contact requires setting aside the presumption of correctness, therefore, it is necessary to examine the nature of the communication to assess its impact on the factfinding process. *Cf. Rushen v. Spain,* 464 U.S. 114, 119–20, 104 S.Ct. 453, 456, 78 L.Ed.2d 267 (1983) (holding that *ex parte* communication between judge and juror must be evaluated for prejudicial effect).

Here, although the judge and attorney could not recall much detail, they both admitted to discussing the merits of Cockrum's claims, and the judge concedes that the prosecutor was advocating the State's position during their conversations. They specifically recall discussing Cockrum's claim that he received ineffective assistance of counsel at the punishment phase, a claim which the judge and attorney felt turned on an application of *Penry v. Lynaugh,* 492 U.S. 302, 109 S.Ct. 2934, 106 L.Ed.2d 256 (1989). *See Deposition of the Honorable Jack Carter,* at 19–20; *Deposition of Winonia Griffin,* at 10; *see also Findings of Fact and Conclusions of Law,* ¶ 28 ("Evidence of physical and psychological abuse, drug abuse, and voluntary intoxication does not rise to the level of *Penry* mitigating evidence. Defense Counsels were not ineffective for failing to present such evidence."); *Response to Petitioner's Application for Writ of Habeas Corpus,* at 29–30 ("Applicant essentially argues that his trial counsel was ineffective because they failed to present mitigating evidence in accord with *Penry v. Lynaugh.*"). It is found that the *ex*

*parte* communications at issue in this case were not innocuous or harmless, but rather struck at the heart of the factfinding process.

The Fifth Circuit considered the effect of *ex parte* contacts on the presumption of correctness in *James v. Collins*, 987 F.2d 1116, 1122–23 (5th Cir.), *cert. denied*, 509 U.S. 947, 114 S.Ct. 30, 125 L.Ed.2d 780 (1993), and held the presumption to apply despite allegations that the state habeas court's findings resulted from an *ex parte* collaboration between judge and prosecutor. *James*, however, is distinguishable from the instant case for several reasons. First, and foremost, the federal district court in *James* found no evidence that any misconduct had occurred. *Id.* at 1123. In this case, there is ample evidence of *ex parte* discussions between judge and prosecutor touching on the merits of Cockrum's claims for relief. Second, the applicant in *James* did not "seriously contest" the accuracy of the majority of the state court's findings, *id.* at 1122, and indeed, most of the applicant's claims, which included broad-based challenges to Texas's capital-murder sentencing scheme, did "not depend on the facts as developed by the state court," *id.* at 1123 n. 9. Cockrum, by contrast, vigorously contests the accuracy of the state court's findings, and most of his claims—particularly the ineffective assistance claim and the claim that the State misrepresented the terms of Morgan's plea bargain—are fact-intensive.

"In capital proceedings generally, this Court has demanded that factfinding procedures aspire to a heightened standard of reliability." *Ford v. Wainwright*, 477 U.S. 399, 411, 106 S.Ct. 2595, 2602, 91 L.Ed.2d 335 (1986) (plurality opinion). The factfinding procedure employed by the state habeas court in this case fell well short of this aspiration, and lacked two fundamental safeguards of due process—notice and the opportunity to be heard. It is found that the *ex parte* communications between judge and prosecutor undermined the integrity and reliability of the factfinding process so as to deny Cockrum a fair hearing at the state habeas level. Under any of several statutory exceptions, 28 U.S.C. § 2254(d)(2), (6) & (7), it is found that the presumption of correctness afforded a state habeas court's findings of fact should not apply in this case.

## C. Default

The State contends that even if the state court's factfinding procedures were inadequate, Cockrum is not entitled to complain of these inadequacies in federal court because he raised no objection before the Texas Court of Criminal Appeals. Drawing on the procedural default doctrine and the Supreme Court's decision in *Keeney v. Tamayo–Reyes*, 504 U.S. 1, 112 S.Ct. 1715, 118 L.Ed.2d 318 (1992), the State argues that in light of the plenary authority of the Court of Criminal Appeals in habeas corpus proceedings, it is incumbent upon a petitioner to object to any perceived errors in the state district court's factfinding process.[5] By failing to so object,

---

5. Because the State's argument relies on the nature of a habeas corpus proceeding in Texas state court, it is appropriate to briefly summarize the relationship between the Court of Criminal Appeals and the state district court in such proceedings. It should be noted, however, that Texas has significantly altered habeas corpus proceedings for persons sentenced to death. Tex. Code Crim.P. art. 11.071. The summary below describes the state of the law at the time Cockrum's petition was considered by the Texas state courts.

In Texas, even though an application for post-conviction relief is initially considered by the district court in the county where the applicant was convicted, "the only ultimate decision in a post-conviction habeas case is that made by the Texas Court of Criminal Appeals." *Briddle v. Scott*, 63 F.3d 364, 375 (5th Cir.), *cert. denied*, —— U.S. ——, 116 S.Ct. 687, 133 L.Ed.2d 531 (1995). The district court bears the respon-

sibility for developing the record and entering findings when disputes over material facts exist, Tex.Code Crim.Proc.Ann. art. 11.07, § 2(b), but once entered, the district court's findings and conclusions, together with the transcript of any hearings it has conducted, are automatically transmitted to the Court of Criminal Appeals, *id.* § 2(c). The higher court reviews the district court's findings, and has the exclusive authority to grant or deny relief. *Ex parte Alexander*, 685 S.W.2d 57, 60 (Tex.Crim.App.1985). The Court of Criminal Appeals need not defer in any manner to the lower court's findings of fact, Tex.Code Crim.P. art. 11.07, § 3; *Ex parte Ramirez*, 577 S.W.2d 261, 263 (Tex.Crim.App. [Panel Op.] 1979), and can remedy any perceived defects in the lower court's factfinding process by ordering the district court to conduct a hearing, *Ex parte Campos*, 613 S.W.2d 745, 746 (Tex.Crim.App. 1981), or even by finding facts itself, Tex.Code Crim.Proc.Ann. art. 11.07, § 3.

an applicant relinquishes the right to complain in federal court of those defects, unless the applicant can demonstrate cause and prejudice. Thus, in this case, the State argues that within the three-month period between the entry of findings of fact by the district court and the denial of the application by the Court of Criminal Appeals, Cockrum could and should have objected that the factfinding process was inadequate because of the *ex parte* communications between judge and prosecutor. In response, Cockrum does not argue that cause and prejudice justify his failure to object; rather, he argues that he has not defaulted in any way his right to challenge the presumption of correctness.

 Initially, it bears emphasis that the procedural default doctrine, in which federal review is barred because the applicant has failed to comply with an adequate and independent state procedural rule, is not applicable to this case. *Cf. Coleman v. Thompson,* 501 U.S. 722, 750, 111 S.Ct. 2546, 2565, 115 L.Ed.2d 640 (1991). The doctrine applies *"only* if the state court denied relief *because of* the defendant's violation of state procedural requirements," *Shaw v. Collins,* 5 F.3d 128, 131 (5th Cir.1993) (emphasis in original), and the Court of Criminal Appeals did not rest its denial of any of Cockrum's claims on the failure to raise an objection of the sort described by the State. Moreover, no provision in Texas law requires an applicant to file objections with the Court of Criminal Appeals, and the failure to object to the adequacy of the lower court's factfinding process does not waive review of such errors. *Cf.*

*Coleman,* 501 U.S. at 727, 111 S.Ct. at 2553 (applying procedural default doctrine to rule specifying that "no appeal shall be allowed unless a notice of appeal is filed with the trial court within 30 days of final judgment"); *Wainwright v. Sykes,* 433 U.S. 72, 86, 97 S.Ct. 2497, 2505, 53 L.Ed.2d 594 (1977) (applying doctrine to contemporaneous objection rule, interpreted as requiring that objection be raised "at trial or not at all"); *Francis v. Henderson,* 425 U.S. 536, 537, 96 S.Ct. 1708, 1709, 48 L.Ed.2d 149 (1976) (applying doctrine to state rule providing that unless objection was timely made, "all such objections shall be considered as waived and shall not afterwards be urged or heard"). Clearly, the Court of Criminal Appeals can and does remedy inadequate factfinding procedures in the absence of objections by the litigants. *E.g., Ex parte Adams,* 707 S.W.2d 646, 647 (Tex. Crim.App.1986); *Ex parte Acosta,* 672 S.W.2d 470, 472 (Tex.Crim.App.1984); *Ex parte Campos,* 613 S.W.2d 745, 746 (Tex. Crim.App.1981); *Ex parte Harris,* 593 S.W.2d 330, 333 (Tex.Crim.App.1979). Indeed, contrary to the State's argument, it is uncertain that any objection raised by Cockrum would have been considered at all. Texas Rule of Appellate Procedure 213 provides for summary disposition by the Court of Criminal Appeals after an initial screening of a habeas corpus application—a screening that Cockrum's application did not survive— and suggests that briefing and argument will be entertained only after the Court of Criminal Appeals determines that the application should be submitted to the court for more thorough review.[6]

6. The text of the rule provides:

 (a) Initial Review. After administrative processing, post-conviction applications for writ of habeas corpus pursuant to Article 11.07 of the Code of Criminal Procedure shall be assigned by the administrative staff to a judge, in rotation, and the judge to whom such an assignment is made shall have the responsibility of making an initial review and reporting on such case to the court. The court may deny relief upon the findings and conclusions of the trial court with or without an evidentiary hearing. The court may likewise deny relief based upon its own review of the application or may issue such other instructions or orders as may be appropriate.

 (b) Tentative Disposition. In the event that at least five members of the court are of the tentative opinion that the case should be filed

and set for submission to the court, the cause will be docketed and heard as though originally presented to the court or as an appeal. No motions for rehearing or reconsideration will be entertained from a denial of relief without docketing of the cause. The court, however, may on its own motion reconsider such initial disposition.

Tex.R.App.P. 213.

 In support of the proposition that the Court of Criminal Appeals would have entertained an objection from Cockrum, the State cites only two cases, one of which is inapposite and the other of which is unpersuasive. In *Ex parte Reed,* 610 S.W.2d 495, 496–97 (Tex.Crim.App.1981), the Court of Criminal Appeals noted the failure of the applicant to raise an objection during the live evidentiary hearing in the district court. In the other, *Ex parte Cantrell,* 571 S.W.2d 33, 35 (Tex.

The State relies most heavily on *Keeney v. Tamayo–Reyes*, 504 U.S. 1, 112 S.Ct. 1715, 118 L.Ed.2d 318 (1992), in which the Supreme Court determined the standard to apply when a habeas corpus applicant seeks an evidentiary hearing after failing to properly develop material facts in state court. In doing so, the Court partially overruled *Townsend v. Sain*, 372 U.S. 293, 313, 83 S.Ct. 745, 757, 9 L.Ed.2d 770 (1963), the decision in which the Court originally identified the six circumstances when a federal court must hold an evidentiary hearing on a habeas corpus application challenging a state conviction. One of the *Townsend* circumstances is when "the material facts were not developed at the state-court hearing," *id.* at 313, 83 S.Ct. at 757, as long as the failure to develop the facts was not attributable to the "inexcusable neglect" of the applicant, *id.* at 317, 83 S.Ct. at 759. The *Townsend* Court defined inexcusable neglect by citing to *Fay v. Noia*, 372 U.S. 391, 438, 83 S.Ct. 822, 848–49, 9 L.Ed.2d 837 (1963), a procedural default case which announced the "deliberate bypass" standard, whereby an applicant's neglect is deemed inexcusable only if the applicant intentionally forgoes an opportunity for state review. Because the Court ultimately abandoned *Fay*'s deliberate bypass standard in the procedural default context in favor of the more stringent cause and prejudice standard, *Coleman*, 501 U.S. at 750, 111 S.Ct. at 2565, the Court in *Keeney* similarly replaced the deliberate bypass standard approved in *Townsend* with the cause and prejudice standard. *See Keeney*, 504 U.S. at 8, 112 S.Ct. at 1719. Thus, after *Keeney*, an applicant seeking a federal evidentiary hearing on the grounds that the material facts were not adequately developed at the state-court level must show cause and prejudice for the applicant's failure to develop them.

The State seeks to extend *Keeney* to this case, but an applicant's inexcusable neglect, under a deliberate bypass standard or otherwise, has never been a part of the inquiry into whether a state hearing was full and fair. Rather, such an inquiry is confined to the factor at issue in *Keeney*—whether the material facts were adequately developed at the state court hearing.[7] In *Townsend*, the Court was concerned that an applicant would take advantage of this factor by "deliberately withholding evidence from the state factfinder in the hope of finding a more receptive forum in a federal court." *Keeney*, 504 U.S. at 16, 112 S.Ct. at 1724 (O'Connor, J., dissenting); *see Townsend*, 372 U.S. at 317, 83 S.Ct. at 759 (inexcusable neglect requirement prevents "needless piecemeal presentation of constitutional claims"); *cf. McCleskey v. Zant*, 499 U.S. 467, 111 S.Ct. 1454, 113 L.Ed.2d 517 (1991) (applying cause and prejudice standard to abuse of the writ doctrine because of similar incentives to withhold claims for manipulative purposes). With respect to the denial of a full and fair hearing, however, *Townsend* expressed no such concern: "Even where the procedure employed does not violate the Constitution, if it appears to be seriously inadequate for the ascertainment of the truth, it is the federal judge's duty to disregard the state findings and take evidence anew." *Townsend*, 372 U.S. at 316, 83 S.Ct. at 759.

The State nonetheless argues that a concern for abuse similar to the concern underlying *Keeney* justifies the application of a cause and prejudice standard in the context

Crim.App. [Panel Op.] 1978), the court commented on the lack of a brief as part of a general failure on the part of the State to meaningfully oppose the habeas corpus petition at any stage of proceedings. Even ascribing the full significance to these cases that the State does, these two isolated opinions fall far short of the procedural default doctrine's requirement that a state rule be firmly established and regularly followed. *See Reed v. Scott*, 70 F.3d 844, 846–47 (5th Cir.1995), *cert. denied*, —— U.S. ——, 116 S.Ct. 1452, 134 L.Ed.2d 570 (1996).

**7.** Indeed, *Keeney* may be further confined to the determination of when an evidentiary hearing is compelled. The Court in *Keeney* emphasized that this inquiry is distinct from the question of when the presumption of correctness should attach, despite the similarities between the factors governing the two, *compare Townsend*, 372 U.S. at 313, 83 S.Ct. at 757 *with* 28 U.S.C. § 2254(d), and also pointed out that "§ 2254(d) does not mention or recognize any exception for excusable neglect," *Keeney*, 504 U.S. at 10 n. 5, 112 S.Ct. at 1720 n. 5. It is nonetheless assumed for purposes of this opinion that equitable doctrines of the type urged by the State can apply to the statutory question of when the presumption of correctness should attach.

of this case—*i.e.*, whenever a lower state court deprives an applicant of a full and fair hearing, the applicant has an incentive to withhold objection from a higher state court with the expectation that a federal court will set aside the presumption of correctness. To the extent that this is a realistic concern, the procedural default doctrine and the exhaustion of state remedies requirement, 28 U.S.C. § 2254(b), adequately protect against such abuse and appropriately accommodate the interests of comity and federalism identified by the State. These doctrines assure that an applicant will take full advantage of the State's procedures for preserving error and pursuing appellate remedies before a federal court considers his claims for relief. Nothing in § 2254(d) or the Supreme Court's decisions adopting the cause and prejudice standard suggests that a federal court must presume correct facts found pursuant to a process that is less than full and fair simply because an applicant did not raise an objection that the state court did not require, and most likely did not allow, him to make. It is found that Cockrum's failure to lodge an objection with the Court of Criminal Appeals concerning the lower court's factfinding procedures has no impact on the determination of whether the presumption of correctness should attach in this case.

### D. Conclusion

Cockrum was denied a fair hearing of his claims at the state habeas level because of *ex parte* communications between the state judge and prosecutor. Accordingly, it is found that the state court's findings of fact are not entitled to a presumption of correctness, and that the relevant facts underlying Cockrum's claims for relief should be redetermined based on the evidence heard at the federal evidentiary hearing.[8]

### V. Claims for Relief

In the state habeas proceeding and in his initial filings in federal court, Cockrum raised over twenty grounds for relief. By the time of the evidentiary hearing, all but the following four claims had been abandoned: (1) a claim that the State, in violation of due process, suppressed impeachment evidence and failed to correct misleading testimony concerning the terms of Jerry Morgan's plea bargain; (2) a claim that Cockrum's due process rights were violated in connection with the denial of his motion to transfer venue; (3) a claim that the jury's discussions of the possibility of parole during deliberations at the punishment phase denied Cockrum due process; and (4) a claim that Cockrum was denied the effective assistance of counsel, guaranteed by the Sixth Amendment, in the punishment phase of his trial. Cockrum bears the burden of proving these claims by a preponderance of the evidence. *See Johnson v. Zerbst*, 304 U.S. 458, 469, 58 S.Ct. 1019, 1025, 82 L.Ed. 1461 (1938); *United States v. Atkins*, 834 F.2d 426, 435 (5th Cir.1987).

### A. Suppression of Evidence and Misleading Testimony

Jerry Morgan, who drove Cockrum to and from the scene of the crime, was originally indicted for capital murder in Bowie County. After jury selection began for his trial, Morgan's attorney negotiated a plea bargain, whereby Morgan pleaded guilty to burglary of a habitation. Morgan agreed to testify against Cockrum, which he did, and the State

---

8. Alternatively, Cockrum argues that if the presumption of correctness applies, the evidence adduced at the federal evidentiary hearing satisfies his burden to rebut the presumption. *See* 28 U.S.C. § 2254(d) (providing that if none of the eight exceptions apply, then "the burden shall rest upon the applicant to establish by convincing evidence that the factual determination by the State court was erroneous"). This basis for overturning the presumption—that specific factual determinations of the state court are clearly and convincingly erroneous—is the one feature of § 2254(d) that is preserved in the AEDPA's amendments to the habeas corpus statute. *See*

AEDPA § 104 (to be codified at 28 U.S.C. § 2254(e)(1)) ("The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence."). Because the analysis of this alternative argument would be the same under both laws, and because the issue is most easily addressed after a thorough review of the claims for relief, the contention that the evidence introduced at the evidentiary hearing rebuts the presumption of correctness is treated *infra* Part VI(B), concurrently with the analysis of Cockrum's claims for relief under the AEDPA.

agreed to recommend a ninety-nine year sentence, which is what Morgan received.

Despite the lengthy term of years, this was a favorable deal for Morgan because, under the prevailing practice at that time in Texas, Morgan knew that he would likely be paroled in approximately six years.[9] The preponderance of the evidence indicates that during the plea negotiations, Morgan's attorney told Morgan, in the presence of the prosecution, that accepting the State's offer and pleading guilty to a ninety-nine year sentence would likely mean release on parole after approximately six years. The prosecution did not explicitly promise Morgan that he would be eligible for parole in approximately six years, or that Morgan would be paroled when first eligible.

Although Morgan did not make a *quid pro quo* agreement with the State for early release on parole in exchange for his testimony, it appears that the prosecution did agree not to write a letter opposing Morgan's parole at such time as the Texas Board of Pardons and Paroles reviewed his parole eligibility. Whenever a Texas state inmate becomes eligible for parole, the district attorney in the county of conviction, among other persons, is notified and provided with an opportunity to write a letter to the Texas Board of Pardons and Paroles, supporting or opposing the inmate's parole. The letter is merely advisory; the Board of Pardons and Paroles, not the district attorney, possesses the authority to grant or deny parole.

Morgan's attorney testified that when negotiating a plea, it is his standard practice to obtain assurances that the prosecution will not write a letter opposing his client's parole,

and he vaguely remembers making such a request on Morgan's behalf. *Transcript,* Feb. 20, 1996, at 139–42 (testimony of Paul Hoover). Morgan, on the other hand, specifically remembers that the prosecution agreed to recommend that he make parole at the first opportunity, but this seems unlikely in light of his attorney's testimony. *Transcript,* Feb. 21, 1996, at 192–93 (testimony of Jerry Morgan). At the other extreme, one of the prosecutors who negotiated the plea insisted that he would never make any promises about a defendant's parole in the course of a plea bargain. *Deposition of James Elliott,* Jan. 17, 1996, at 45, 50, 55. He conceded, however, that his superior, who was the District Attorney of Bowie County and who participated in Morgan's plea negotiations, may have agreed to a request from Morgan's attorney not to oppose his client's parole.[10] *Id.* at 49–50. The prosecutor also testified that the Bowie County District Attorney's Office has never opposed parole for persons, such as Morgan, convicted on a guilty plea, *id.* at 48, and thus, it seems plausible that the such a condition would be agreed to when proposed by Morgan's attorney. Although the evidence is not unequivocal, it is found that the State promised not to oppose Morgan's parole. This promise was not disclosed to Cockrum's attorneys.

At Cockrum's trial, Morgan testified that he had pleaded guilty and received a ninety-nine year sentence, but no mention was made of his parole eligibility or the agreement not to oppose parole:

Q. [A]re you under a sentence for ninety-nine (99) years?

A. I am.

Morgan pleaded guilty to an unaggravated felony, and there was no deadly weapon finding—in other words, his good conduct time would be taken into account when calculating his parole eligibility date. Assuming Morgan's behavior in prison was reasonably good, predicting that he would be eligible for parole in approximately six years was a simple matter of applying the rate of good time credits to the twenty-year base figure. The forecast proved accurate in this case, as Morgan was in fact paroled after serving approximately six years in prison. He has since been returned to custody for violation of the terms of his parole.

9. A thorough canvass of Texas parole law at the time of Morgan's conviction can be found in the deposition of the Chairman of the State Classification Committee for the Texas Department of Corrections, Institutional Division. *Deposition of S.O. Woods, Jr.,* Jan. 23, 1996. A brief summary will suffice here. In 1986, for any sentence of sixty years or greater, a convict was first eligible for parole after twenty years. Unless the offense was aggravated or unless it was found that a deadly weapon was used during the commission of the offense, the inmate could accelerate the initial parole date through the accumulation of good time credits, and the rate of good time afforded inmates at that time was generous.

10. The District Attorney is now deceased.

. . . .

Q. Did you plead guilty to the burglary of Eva May's store?

A. I did.

Q. And then were you sentenced?

A. I was.

Q. How many years, please?

A. Ninety-nine (99) years.

*Statement of Facts,* at 1253.

Although the defense did not know of the State's promise not to oppose Morgan's parole, Cockrum's counsel was aware, either through his own knowledge of Texas parole practice or through conversations with Morgan's attorney, that Morgan would serve only a fraction of his actual sentence. Proof of the attorney's knowledge is in his trial notes, which describe the nature of Morgan's plea bargain as "serve only 6–7 yrs on 99 year sentence." *Respondent's Exhibit No. 17; Transcript,* Feb. 22, 1996, at 36 (testimony of Rick Shumaker). He decided not to ask Morgan about his parole eligibility after determining that the potentially damaging effect of this information outweighed any benefits of revealing it to the jury. Specifically, he feared that if the jury realized how little time a person could actually serve on a lengthy prison sentence, then it would be less likely to consider a life sentence for Cockrum in the event he were found guilty. *Transcript,* Feb. 22, 1996, at 36–37 (testimony of Rick Shumaker).

Under the principles of due process developed in *Napue v. Illinois,* 360 U.S. 264, 269, 79 S.Ct. 1173, 1177, 3 L.Ed.2d 1217 (1959), and *Giglio v. United States,* 405 U.S. 150, 153–54, 92 S.Ct. 763, 765–66, 31 L.Ed.2d 104 (1972), the State must disclose material impeachment evidence to a defendant, and must also correct false testimony when it appears. *See Amos,* 61 F.3d at 346 & n. 49. Cockrum contends that at his trial, the State violated these principles in two distinct ways (1) by concealing the agreement that the Bowie County District Attorney's Office would not oppose Morgan's parole when he came up for review before the Board of Pardons and Paroles, and (2) by eliciting testimony concerning the length of Morgan's sentence that misled the jury into believing Morgan would

serve ninety-nine years in prison. Each claim is evaluated in turn.

**1. Concealment of Promise Not to Oppose Parole**

In order to be entitled to relief, Cockrum must demonstrate: (1) the prosecution suppressed evidence, (2) the evidence was favorable to the defense, and (3) the evidence was material. *Spence v. Johnson,* 80 F.3d 989, 994 (5th Cir.1996). "[E]vidence is material only if there is a reasonable probability that, had the evidence been disclosed, the result of the proceeding would have been different." *United States v. Bagley,* 473 U.S. 667, 682, 105 S.Ct. 3375, 3383, 87 L.Ed.2d 481 (1985); *see also Kyles v. Whitley,* — U.S. ——, ——, 115 S.Ct. 1555, 1566, 131 L.Ed.2d 490 (1995). "In assessing the materiality of undisclosed impeachment evidence, 'we must consider the nature of the impeachment evidence improperly withheld and the additional evidence of the defendant's guilt independent of the disputed testimony.'" *Wilson v. Whitley,* 28 F.3d 433, 439 (5th Cir.) (quoting *United States v. Weintraub,* 871 F.2d 1257, 1262 (5th Cir.1989)), *cert. denied,* — U.S. ——, 115 S.Ct. 754, 130 L.Ed.2d 653 (1994).

The assurances made by Morgan's attorney in the presence of the prosecution do not create a promise by the State of early parole, *see Self v. Blackburn,* 751 F.2d 789, 792–93 (5th Cir.1985), or early parole eligibility, *see Hayes v. Maggio,* 699 F.2d 198, 202–04 (5th Cir.1983). Thus, the State had no duty to disclose any information about Morgan's parole eligibility—information that was, in any event, known by Cockrum's attorneys. What the prosecution did promise and did not reveal to the defense was that when Morgan became eligible for parole, the Bowie County District Attorney's Office would not write a letter of opposition to the Board of Pardons and Paroles.

In evaluating the materiality of concealing a similar promise, the Fifth Circuit has recently held:

[T]he fact that such promises were made is not material on the record before us. No reasonable jury would have believed [the witness/accomplice] fabricated his testimo-

ny—incriminating himself and his brother in kidnapping, rape, and murder—and pleaded guilty to two life sentences in prison based on oral promises that two individuals would not oppose his parole efforts some time in the distant future. Such promises were hardly a guarantee that [the witness/accomplice] would be paroled, nor did they bind future ... County officials.

*Spence,* 80 F.3d at 996. Evaluating the promise's potential impact in this case in light of this holding confirms that the failure to disclose the promise to the defense was not material.[11] As identified in *Spence,* the incremental impeachment value of the evidence is slight, and it is highly unlikely, and certainly not reasonably probable, that the jury would have discredited Morgan's testimony if it had known of the promise. Indeed, the jury may never have learned of the promise if it had been disclosed to Cockrum—the attorney who cross-examined Morgan doubted that he would have brought the evidence out for the same reasons he did not question Morgan about the parole implications of a ninety-nine year sentence. *Transcript,* Feb. 22, 1996, at 63–64 (testimony of Rick Shumaker).

Furthermore, although Morgan's testimony was the primary evidence establishing Cockrum as the triggerman, there was sufficient evidence connecting Cockrum to the crime for the jury to convict. Shortly before and after the murder, several witnesses saw Cockrum a short distance from the crime scene with a gun of the same type used to kill the victim. *Statement of Facts,* at 1178 (testimony of Kenneth Thom); *id.* at 1300–03 (testimony of Jana McGraw); *id.* at 1242–44

(testimony of Patrick Besant–Matthews, M.D.). Cockrum was apprehended after fleeing to Arkansas and checking into a motel under an assumed name, and despite having been impecunious several days before the robbery, he possessed a significant sum of money at the time of his arrest. *Id.* at 1306–07 (testimony of Jana McGraw); *id.* at 1324 (testimony of Thomas Hodge). Certainly, the State's case would have been weakened if Morgan had been discredited, but it cannot be said that an acquittal was reasonably probable in the absence of his testimony.

### 2. Misleading testimony

Cockrum concedes that Morgan's testimony was not perjurious. He rests his *Napue/Giglio* claim instead on the argument that Morgan's "carefully tailored" testimony deceived the jury into believing that he would serve ninety-nine years behind bars, and thus created a misleading impression of the nature of Morgan's plea bargain. Without an understanding of Morgan's parole eligibility, Cockrum argues, the jury could not see what Morgan stood to gain by pleading guilty and agreeing to testify. Cockrum further alleges that the misimpression was not an innocent mistake, but rather part of a deliberate strategy by the State—*i.e.,* the prosecution crafted Morgan's plea bargain with an eye toward bolstering Morgan's credibility before Cockrum's jury and with the knowledge that early parole eligibility was crucial to Morgan's decision to accept the deal, asked intentionally leading questions to create the misleading impression that Morgan would serve ninety-nine years in prison without parole, and capitalized on this impression at closing argument.[12] The State, in

---

11. Because *Spence* applied the more stringent "reasonable probability" standard of error and because Cockrum fails even this test, it is unnecessary to consider the State's argument that the more forgiving "substantial and injurious effect or influence" standard applies to the evaluation of an error of this type on collateral review. *See Brecht v. Abrahamson,* 507 U.S. 619, 113 S.Ct. 1710, 1717–23, 123 L.Ed.2d 353 (1993).

12. At the guilt-innocence phase, the defense argued that Morgan committed the murder and framed Cockrum. In support of this theory, it was pointed out that Morgan led authorities to the murder weapon, and it was suggested that

the gun had not been disposed of, but rather deliberately buried in a location where it could readily be found. *Statement of Facts,* at 1370–71 (argument of Rick Shumaker). At closing argument, the prosecutor relied on the severity of a "ninety-nine year sentence" to counter the defense's suggestion that Morgan framed Cockrum:

> [W]e're not up here to figure out if Jerry Morgan had something to do with it. I'm telling you he had something to do with it. He drove him back after he killed Eva May. He's in the penitentiary for 99 years because of it. Now, let me give you an example of a rabbit trail. Well, I think that the weapon might have been buried so somebody could find it. So some-

response, not only opposes this claim on the merits, but also argues that relief would be barred under the nonretroactivity doctrine, which generally prohibits the application of new rules of criminal law on collateral review. *See generally Teague v. Lane,* 489 U.S. 288, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989) (plurality opinion).

■■■■ The question of retroactivity must be addressed first. *Penry v. Lynaugh,* 492 U.S. 302, 313, 109 S.Ct. 2934, 2943–44, 106 L.Ed.2d 256 (1989); *Smith v. Black,* 904 F.2d 950, 981–82 (5th Cir.1990), *vacated on other grounds,* 503 U.S. 930, 112 S.Ct. 1463, 117 L.Ed.2d 609 (1992). Notwithstanding the presence of two narrow exceptions,[13] a federal court is barred from considering a claim on collateral review unless, at the time that the conviction became final, a state court "would have felt compelled by existing precedent to conclude that the rule [the applicant] seeks was required by the Constitution." *Caspari v. Bohlen,* 510 U.S. 383, 390, 114 S.Ct. 948, 953, 127 L.Ed.2d 236 (1994) (quoting *Saffle v. Parks,* 494 U.S. 484, 488, 110 S.Ct. 1257, 1260, 108 L.Ed.2d 415 (1990)); *see also Graham v. Collins,* 506 U.S. 461, 465–67, 113 S.Ct. 892, 897, 122 L.Ed.2d 260 (1993). The rule Cockrum seeks here is that due process is violated when the truthful testimony of a witness creates a false impression that serves to conceal the true nature of a witness's plea bargain.

Well before Cockrum's conviction became final, the Fifth Circuit, as well as other circuits, held that "technically correct, yet seriously misleading" testimony could fall within the due process concerns of *Napue* and *Giglio. E.g., Blankenship v. Estelle,* 545 F.2d 510, 513 (5th Cir.1977); *Dupart v. United States,* 541 F.2d 1148, 1149–50 (5th Cir.1976) (per curiam); *see United States v. McClintic,* 570 F.2d 685, 692 (8th Cir.1978); *Boone v. Paderick,* 541 F.2d 447, 450 (4th Cir.1976), *cert. denied,* 430 U.S. 959, 97 S.Ct. 1610, 51 L.Ed.2d 811 (1977); *United States v. Harris,* 498 F.2d 1164, 1169 (3d Cir.), *cert. denied,* 419 U.S. 1069, 95 S.Ct. 655, 42 L.Ed.2d 665 (1974); *see also Memorandum Opinion and Order,* Nov. 15, 1995, at 12 (holding that Cockrum's conviction became final, for purposes of *Teague,* on March 6, 1989). In each of these cases, due process was violated because the effect of the witness's truthful answer was to falsely deny what they were being asked—whether a deal had been struck with the prosecution. For example, the testimony of a witness who asserts that no "case" is pending against him and that his testimony is "voluntary"—when in fact he had been promised immunity against pending state and federal charges and received monetary payment in exchange for his testimony—is "highly misleading to the jury," although "technically not perjurious." *Dupart,* 541 F.2d at 1150; *see also Blankenship,* 545 F.2d at 513 ("[W]e will not tolerate prosecutorial participation in technically correct, yet seriously misleading, testimony which serves to conceal the existence of a deal with material witnesses."). Similarly, in reviewing testimony that included a witness's assertion that he had not struck a deal with the United States Attorney's office of a particular district—when he had in fact struck a deal with the United States Attorney's office in *another* district—the Fifth Circuit remarked, "The testimony heard by the jury, if not outright lies, certainly conveyed the false impression that none of these three witnesses had re-

---

body could find it and do what? Throw him in the 'slammer' for 99? Does that make sense? We're not going to chase rabbits, folks. *Id.* at 1378 (argument of James Elliott).

**13.** The first exception is that all new rules of substantive criminal law apply retroactively. In the death penalty context, this exception covers "not only rules forbidding criminal punishment of certain primary conduct but also rules prohibiting a certain category of punishment for a class of defendants because of their status or offense." *Penry,* 492 U.S. at 330, 109 S.Ct. at 2953. Under the second exception, a new rule of criminal procedure will apply retroactively if the new rule

is a "'watershed rule[] of criminal procedure' implicating the fundamental fairness and accuracy of the criminal proceeding." *Saffle v. Parks,* 494 U.S. 484, 495, 110 S.Ct. 1257, 1264, 108 L.Ed.2d 415 (quoting *Teague,* 489 U.S. at 311, 109 S.Ct. at 1076–77 (plurality opinion)). The Supreme Court has made clear that a rule meeting this second exception requires two elements: the rule must contribute to factfinding reliability and must be an "absolute prerequisite to fundamental fairness." *Sawyer v. Smith,* 497 U.S. 227, 244, 110 S.Ct. 2822, 2832, 111 L.Ed.2d 193 (1990) (quoting *Teague,* 489 U.S. at 314, 109 S.Ct. at 1077).

**1436**

ceived any promises of leniency or other considerations." *United States v. Barham*, 595 F.2d 231, 241 (5th Cir.1979). In light of these decisions, it is found that ruling in Cockrum's favor on this claim would not retroactively apply a new rule of law.

 While not barred, this claim fails on the merits. First, Morgan's testimony was not so misleading as to rise to the level of a due process violation. It is one thing to say that a witness's truthful, but misleading responses to questions inquiring whether a deal has been struck creates a false impression that a deal has not been struck. It is another to say that the truthful description of a witness's sentence has the effect of falsely concealing a deal struck with the State, or that the truthful assertion of the length of a witness's sentence is "highly misleading" in the absence of an estimate of the witness's parole eligibility. In other words, for a witness to say that he has no deal with a particular United States Attorney's Office is, in effect, to deny that he has any deal at all with the government. For Morgan to say he is under a ninety-nine year sentence, on the other hand, is not to deny that a deal has been reached in exchange for his testimony or to deny the possibility that he will be paroled. Morgan's testimony was neither perjurious nor the type of "technically correct, yet seriously misleading" testimony condemned in *Dupart, Blankenship,* and *Barham.*

 Additionally, this claim must fail because Cockrum's counsel was aware of the parole implications of Morgan's sentence, and chose to avoid the issue on cross-examination. Even if the jury were under the misimpression that Morgan would serve ninety-nine years in prison without parole, it was a misimpression that the defense, as a result of reasonable trial strategy, decided not to correct. While *Giglio/Napue* error has been found despite the defense's knowledge of the falsity of the testimony, a constitutional violation has never been found when the decision to leave the error uncorrected was the result of a deliberate and reasonable trial tactic. *See Dupart,* 541 F.2d at 1150 (remanding with directions to determine if defense counsel's failure to impeach was a "deliberate trial tactic"); *United States v. Iverson,* 648 F.2d 737, 738 (D.C.Cir.1981) (per curiam) (petition for rehearing) (drawing distinction between defense counsel's mere awareness of information and decision to forgo use of information); *cf. Barham,* 595 F.2d at 243 n. 17 (suggesting that no reversible error would exist if, among other things, the prosecutor erroneously but "reasonably assumed defense counsel knew the evidence was false and was consciously choosing to let it go unimpeached").

## B. Transfer of Venue Claim

 Under Texas law, a criminal defendant who seeks to transfer venue must support his motion with the affidavits of two residents of the county where the action is instituted, averring that a fair and impartial trial is not possible in that county. Tex.Code Crim.Proc. art. 31.03. If the State files controverting affidavits, the trial judge must hold a hearing to resolve the factual dispute presented. *Id.* art. 31.04. If no controverting affidavits are filed, then the motion to transfer venue must be granted as a matter of law. *Foster v. State,* 779 S.W.2d 845, 855 (Tex.Crim.App.1989), *cert. denied,* 494 U.S. 1039, 110 S.Ct. 1505, 108 L.Ed.2d 639 (1990); *Cockrum,* 758 S.W.2d at 583 n. 3; *McManus v. State,* 591 S.W.2d 505, 516 (Tex.Crim.App. 1979), *partially overruled on other grounds by Reed v. State,* 744 S.W.2d 112 (Tex.Crim. App.1988); *Wall v. State,* 417 S.W.2d 59, 63 (Tex.Crim.App.1967).

Before his trial, Cockrum moved to transfer venue and filed two supporting affidavits stating that Cockrum could not receive a fair trial in Bowie County because of the publicity surrounding the murder. The State filed two controverting affidavits, both of which asserted, in relevant part:

I have read the affidavits in support of Defendant's Motion for Change of Venue in this cause. The affiants of said affidavits are not credible as they are prejudiced to said Defendant and their means of knowledge are not sufficient to support and justify the statements contained therein.

*Record*, at 34, 35. These controverting affidavits were executed by a local bailbondsman and the Sheriff of Bowie County. It was established that during the first day of jury selection, the prosecutor approached the bailbondsman and the Sheriff, who were talking in the hallway of the courthouse, and asked if they thought Cockrum could get a fair trial. When they responded that Cockrum could, the prosecutor had them sign the controverting affidavits.

After jury selection, a hearing was held on the motion to transfer. *Statement of Facts*, at 1105–44. Two representatives of local newspapers testified to the media coverage that Cockrum's trial had received, and Cockrum called the State's compurgators as adverse witnesses. The bailbondsman admitted that, contrary to the sworn statement in his affidavit, he had not read the affidavits in support of Cockrum's motion, and he also testified that he had no personal knowledge of the credibility of Cockrum's affiants. The Sheriff, who was not asked whether he had read Cockrum's supporting affidavits, also admitted that he had no personal knowledge of the credibility of one of Cockrum's affiants. The Sheriff testified that he knew Cockrum's other affiant, and while he thought that the affiant was generally a credible person, he disagreed with the affiant's opinion that Cockrum could not receive a fair trial.

On cross-examination, the bailbondsman testified that he signed the affidavit because he believed that anyone who thought that Cockrum could not get a fair trial must not be credible. The Sheriff likewise testified that although he did not personally know one of Cockrum's affiants, he presumed that the person must be prejudiced in Cockrum's favor, and also that someone living in Bowie County's less populous section generally would not have an adequate basis for assessing the ability of Cockrum to receive a fair trial. Throughout their testimony, both compurgators maintained the position that Cockrum could receive a fair trial in Bowie County.

At the conclusion of the hearing, Cockrum's counsel moved to strike the State's affidavits from the record because they were not based on the personal knowledge of the affiants, and argued that once the affidavits were struck, the motion to transfer had to be granted as a matter of law. The trial court refused to strike the affidavits, and found, based not only on the evidence introduced at the hearing but also on his observations during jury selection, that Cockrum could receive a fair trial. Consequently, the motion to transfer venue was denied. On appeal, the Court of Criminal Appeals rejected the contention that the insufficiency of the State's affidavits entitled Cockrum to a change of venue as a matter of law, and also held that the trial court's denial of the motion to transfer was not an abuse of discretion. *Cockrum*, 758 S.W.2d at 582–84. In a footnote, the Court of Criminal Appeals remarked, "This opinion does not address what consequences might result from the State's compurgators falsely swearing that they knew [Cockrum's] compurgators and knew that their affidavits were unreliable." *Id.* at 583 n. 4. Picking up on this footnote, Cockrum contends that the State's affidavits were perjured, that they should have been struck from the record, and that the motion to transfer venue should have been granted as a matter of law.

■■■ As a threshold matter, it is doubtful that this claim presents any issues of constitutional dimension. It is clear that "the Texas courts and not the federal courts decide the procedural requirements for the hearing on the change of venue." *Cook v. Morrill*, 783 F.2d 593, 596 (5th Cir.1986). Cockrum does not argue constitutional error in the trial court's disposition of the motion on the merits—*i.e.*, that his due process right to a fair and impartial trial was infringed because of extraordinary pretrial publicity.[14] Rather, Cockrum's claim rests on the assertion that he was denied due process because his change of venue motion was not granted as a matter of law. Stated another way, Cockrum claims that he was denied due process be-

---

**14.** To be precise, Cockrum did allege such a claim at one time, *Second Amended Petition for Writ of Habeas Corpus*, Claim C, at 20–26, but has since abandoned it, *Memorandum Opinion and Order*, Nov. 15, 1995, at 2.

cause a hearing was held, evidence was introduced, and the arguments of both sides were heard. While the state-created right *to have a hearing* may create a protected liberty interest, the deprivation of which is a violation of due process, *see, e.g., Pamplin v. Mason,* 364 F.2d 1, 6 (5th Cir.1966) (denial of pretrial hearing on change of venue motion "was in itself a violation of due process"); *see also Vitek v. Jones,* 445 U.S. 480, 488–90, 100 S.Ct. 1254, 1261–62, 63 L.Ed.2d 552 (1980), here Cockrum asserts that the state-created right *not to have a hearing* creates a constitutionally protected liberty interest, the deprivation of which is a violation of due process. Such an assertion is not tenable, and even if it were, would run headlong into the retroactivity doctrine of *Teague v. Lane,* 489 U.S. 288, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989). *See supra* Part V(A).

■ Second, as a factual matter, it does not appear clear from the face of the record, which is all Cockrum relies on for this claim, that the affidavits were perjurious. The compurgators' reasons for signing the affidavits are not patently implausible, and, without the benefit of observing the witnesses' demeanor on the stand, there is no basis for rejecting their explanations. Moreover, the Sheriff was never asked whether he had read Cockrum's affidavits, and he testified that he personally knew one of Cockrum's affiants. Thus, the only sworn statement that can be definitively identified as false is the bail-bondsman's assertion that he had read the affidavits in support of Cockrum's motion. Even this statement cannot be deemed perjurious, however, because a finding of perjury requires a finding of intent to deceive, and the record simply does not support a finding that the State's compurgators intended to deceive the trial court. *See Beckanstin v. United States,* 232 F.2d 1, 4 (5th Cir.1956) ("[I]n order to constitute perjury, a false statement must be made with criminal intent,

that is, with intent to deceive, and must be willfully, deliberately, knowingly, and corruptly false."); *cf.* 18 U.S.C. § 1621 (federal perjury statute); Tex.Pen.Code Ann. § 37.02 (Texas perjury statute). Accordingly, it is found that the controverting affidavits offered in opposition to Cockrum's change of venue motion were not perjurious.[15]

### C. Juror Misconduct

■ Due process forbids a jury's consideration of extrinsic factual matter during the course of its deliberations. *Llewellyn v. Stynchcombe,* 609 F.2d 194, 195 (5th Cir. 1980); *see also United States v. Ruggiero,* 56 F.3d 647, 652 (5th Cir.), *cert. denied,* —— U.S. ——, 116 S.Ct. 397, 133 L.Ed.2d 317 (1995). Cockrum claims that despite the express instruction of the trial judge, the jury improperly considered the effect of parole on a life sentence during its deliberations at the penalty phase.[16] In support of this contention, Cockrum submitted the following affidavit with his petition:

1. My name is Thomas Keith Mitchell.... I was a member of the jury in the capital murder trial of Johnny Cockrum.

2. During deliberations at the sentencing part of the trial, there was one woman who thought Cockrum should be sentenced to life imprisonment. I don't remember her name now, but she was a white woman and kind of overweight. She believed a life sentence was appropriate.

3. In talking to her, it was obvious this woman was not aware that a life sentence meant Cockrum would have been paroled. I told her that a life sentence in Texas meant he would be out on parole in as few as six years, which is a fact I knew from watching news programs and the like. She was not aware of this and she didn't like the fact that Cockrum would be out of custody so quickly.

---

15. This finding forecloses relief under Cockrum's alternate theory, that the prosecutor's subornation of perjurious affidavits "shocks the sensibilities of civilized society" so as to rise to the level of a due process violation. *Moran v. Burbine,* 475 U.S. 412, 433–34, 106 S.Ct. 1135, 1146–48, 89 L.Ed.2d 410 (1986).

16. Before closing arguments at the punishment phase, the jury was instructed: "You will not consider or discuss the amount of time the defendant will be required to serve upon a life sentence, as this is within the exclusive province of the Governor of Texas and is of no concern to this jury." *Record,* at 49 (Charge on Punishment).

4. Once she realized Cockrum would get out in only a few years, she changed her mind about a life sentence and agreed to vote for death. I think it was still hard for her, but she didn't want him out right away any more than the rest of us did. We took the vote again and it was unanimous.

I swear that the foregoing information is true and correct and I so state under pain and penalty of perjury.

*Second Amended Petition for Writ of Habeas Corpus,* app. M (Affidavit of Thomas Keith Mitchell). In a prior order, it was determined that most of the evidence in this affidavit is inadmissible, and that, under Fed. R.Evid. 606(b), the only evidence that can be considered is any outside influence that was brought to bear on the jury. *Memorandum Opinion and Order,* Nov. 15, 1995, at 8–10; *see United States v. Straach,* 987 F.2d 232, 241 (5th Cir.1993) ("While a juror may attack the verdict … by testifying concerning *outside* influences on the jury, (e.g., newspapers, statements by court personnel), his testimony about the jury's internal deliberations cannot result in a mistrial." (emphasis in original) (citations omitted)); *see also Monroe v. Collins,* 951 F.2d 49, 53 (5th Cir.1992) ("roughly accurate" discussion of parole law by the jury does not, in itself, violate due process). With respect to the jury's alleged discussion of parole, it was held that Cockrum must show that the jury obtained its information from outside sources. *Memorandum Opinion and Order,* Nov. 15, 1995, at 10; *see Straach,* 987 F.2d at 242 (rejecting a claim based on the jury's consideration of penalties because "there is no evidence that [the jury] learned about these penalties from outside sources"); *Drew v. Collins,* 964 F.2d 411, 415–16 (5th Cir.1992) (distinguishing between outside influence brought to bear on jury and jurors' violation of court's instructions on parole law), *cert. denied,* 509 U.S. 925, 113 S.Ct. 3044, 125 L.Ed.2d 730 (1993).

In a deposition taken shortly before the evidentiary hearing, Mitchell recanted many of the assertions in the above affidavit.

*Deposition of Thomas Mitchell,* Jan. 18, 1996, at 22–29.[17] Mitchell specifically described the statement that his knowledge about parole was derived "from watching news programs and the like"—which is the only portion of the affidavit suggesting that information may have been introduced from an outside source—as "totally absurd," "ridiculous," and "not true." *Id.* at 26–27. In his deposition, Mitchell describes the incident involving parole as follows:

To my knowledge, now, this is exactly the way I remember it. There was one lady, she could be sitting at this table and I wouldn't recognize her, but she had a question and we were all there to discuss this. She had a question, she said, and if I'm not mistaken, I'm pretty close to exactly what she said, if we give this man life, that means that he's going to be in jail for the rest of his life. Now, we didn't get into a long drawn out two hour discussion about it. She brought up the question and, if I'm not mistaken, somebody there says, not necessarily, it could mean that he could spend the rest of his natural life in prison, but it also could mean a possibility, they didn't say, oh, yeah, he's going to be out in six months, they said a possibility that he could be paroled. Now, there was no long drawn out discussion about it. There was nobody sitting there trying to sway this woman into thinking that he's going to be out in six months because there's not a soul anywhere, Judge Carter or anybody, that can tell you exactly when somebody is going to be eligible for parole or whether they're going to even, you know, come up for parole. Nobody knows and everyone, every one of the jurors knew, except—that's the reason that lady brought it up. She was thinking that life in prison meant for the rest of his natural life without the possibility of parole. And that's exactly what we said, there is the possibility that he could be paroled.

*Id.* at 10–11. At most, this testimony establishes that a brief, isolated, and roughly accurate discussion of parole law took place in the

---

**17.** To account for the change in his testimony, Mitchell explained that an investigator for Cockrum's former habeas counsel pressured him into signing an affidavit that he did not read. *Deposition of Thomas Mitchell,* at 35.

**1440**

jury room. *See Monroe,* 951 F.2d at 53 (holding that such a discussion does not violate due process). In addition, the depositions of five other jurors were taken. None of these jurors recall anything remotely similar to the incidents described in Mitchell's affidavit or his deposition, and none testified to the introduction of extrinsic materials into the jury room. *Deposition of Patricia Reynolds,* Jan. 18, 1996, at 7–8; *Deposition of Karen Stafford,* Jan. 18, 1996, at 9–10; *Deposition of Sherlie Horton,* Jan. 18, 1996, at 7–8; *Deposition of Linda Preston Watson,* Jan. 18, 1996, at 7–8; *Deposition of Joann Fisher,* Jan. 18, 1996, at 8–9. Cockrum has produced little evidence to suggest that any discussion about parole took place, and even less evidence to suggest that the information discussed came from an external source. It is found that Cockrum has not carried his burden of proof with respect to this claim, and, thus, it is found that no juror misconduct occurred.

### D. Ineffective Assistance of Counsel at Punishment Phase

■ Cockrum argues that he was denied his Sixth Amendment right to the effective assistance of counsel during the punishment phase of his trial, because his attorneys failed to investigate potentially mitigating evidence or adequately prepare a defense. Under *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), Cockrum has the burden of proving both that his counsel's performance was deficient and that this deficient performance deprived him of a fair trial. *Westley v. Johnson,* 83 F.3d 714, 719 (5th Cir.1996). In addition to opposing this claim on the merits, the State argues that granting relief to Cockrum would violate the nonretroactivity rule of *Teague v. Lane,* 489 U.S. 288, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989), and also contends that Cockrum has not exhausted his state remedies with respect to this claim.

### 1. Retroactivity

■ As noted above, when the State raises *Teague,* it must be evaluated as a threshold matter, before reaching the merits. *See supra* Part V(A)(2). The State argues that granting relief in this case on this claim

would establish new rules of law for the representation of capital defendants. The legal standard for counsel's duty to investigate, however, was articulated in *Strickland* well before Cockrum's conviction became final. *See also Burger v. Kemp,* 483 U.S. 776, 107 S.Ct. 3114, 97 L.Ed.2d 638 (1987). Cockrum seeks no new rule of law, but only the application of the test developed in *Strickland*—a lawyer must provide reasonably professional representation to his or her client, and when counsel's performance falls below this standard, a new trial is required if the error deprived the client of a fair trial. An ineffective assistance claim is necessarily fact-specific, and simply because the facts are unique, it does not follow that to grant relief announces a new rule of law. It is found that the *Teague* nonretroactivity doctrine does not bar Cockrum from relief on his ineffective assistance of counsel claim.

### 2. Exhaustion of State Remedies

■ Under the exhaustion doctrine, state courts must be afforded a meaningful opportunity to consider a claim before a federal court passes upon it. 28 U.S.C. § 2254(b); *Vasquez v. Hillery,* 474 U.S. 254, 257, 106 S.Ct. 617, 620, 88 L.Ed.2d 598 (1986). The submission of new factual evidence to a federal court can render a claim unexhausted if the new evidence places a claim in a "significantly different and stronger evidentiary posture" than when before the state court. *Brown v. Estelle,* 701 F.2d 494, 495 (5th Cir.1983) (per curiam); *see also Joyner v. King,* 786 F.2d 1317, 1319–21 (5th Cir.), *cert. denied,* 479 U.S. 1010, 107 S.Ct. 653, 93 L.Ed.2d 708 (1986); *Hart v. Estelle Jr.,* 634 F.2d 987, 989 (5th Cir. Unit A 1981) (per curiam). If it is determined that any claim is unexhausted, then the claim is treated as procedurally defaulted. *Gray v. Netherland,* ── U.S. ──, 116 S.Ct. 2074, 135 L.Ed.2d 457 (1996); *see* Tex.Code Crim.P. art. 11.071, § 5(a) (Vernon Supp.1996) (barring consideration of subsequent application for the writ of habeas corpus unless, among other things, the claims asserted could not have been raised in previous application).

■ The State contends that by introducing at the evidentiary hearing the testimony

of Miledge Oglesby, Cockrum's teacher from junior high school; John Blackburn, his ex-father-in-law; and J.R. O'Rear, his former employer, Cockrum has altered the basis of his ineffective assistance claim to such a degree as to render the claim unexhausted.[18] *Transcript,* Feb. 21, 1996, at 104–36 (testimony of Miledge Oglesby); *id.* at 137–54 (testimony of John Blackburn); *Deposition of J.R. O'Rear,* Feb. 29, 1996. Generally, these witnesses testified to their close relationship with Cockrum and his ability to act responsibly—especially his good work habits and respectful and generous personality—when not under the influence of alcohol or drugs. They also testified to the aspects of Cockrum's background that have always formed the basis of this claim—all three were aware of Cockrum's abuse of alcohol and drugs; Oglesby observed Cockrum's disciplinary problems in school, and was somewhat familiar with the circumstances of Cockrum's father's death; and Blackburn was witness to the tumultuous, even violent, marriage between his daughter and Cockrum.

It is found that this evidence does not render the ineffective assistance claim unexhausted. The thrust of this claim in the state court was that Cockrum's attorneys failed to conduct any investigation into their client's background, and had they done so, they would have uncovered a great deal of potentially mitigating information, including the effect on the applicant of the abuse of his father, the psychological harm flowing from Cockrum's role in his father's death, and the extent and consequences of Cockrum's drug abuse. *See Petition for Writ of Habeas Corpus,* at 41–85. The essential basis for the claim remains the same here in federal court. The testimony of Oglesby, Blackburn, and O'Rear flesh out the allegations in the petition and provide a fuller picture of Cockrum, but they do not put this claim in a "significantly different or stronger evidentiary posture" than when before the state court.

**18.** The State also argues that consideration of this evidence is barred by *Keeney v. Tamayo-Reyes,* 504 U.S. 1, 112 S.Ct. 1715, 118 L.Ed.2d 318 (1992). *Keeney,* however, addresses a habeas applicant's right to an evidentiary hearing in the first instance, not the scope of the evidence that may be considered at that hearing.

### 3. Merits of Ineffective Assistance Claim

#### a. Legal Standard

 "Judicial scrutiny of counsel's performance must be highly deferential." *Strickland,* 466 U.S. at 689, 104 S.Ct. at 2065. Cockrum must overcome "a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance," *id.,* and in this regard, "[i]t is not enough to show that some, or even most, defense lawyers would have handled the case differently." *Westley,* 83 F.3d at 719 (quoting *Green v. Lynaugh,* 868 F.2d 176, 178 (5th Cir.), *cert. denied,* 493 U.S. 831, 110 S.Ct. 102, 107 L.Ed.2d 66 (1989)). The focus is on the information available to counsel at the time of trial. *See Strickland,* 466 U.S. at 690, 104 S.Ct. at 2066 (stressing that it is necessary to "judge ... counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct"). Speaking to counsel's duty to investigate, the Court explained:

> [S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments.

*Id.* at 690–91.[19]

 If he succeeds in proving his attorneys' representation fell below an objec-

**19.** The State contends that in order to establish deficient performance based on an alleged failure to investigate, Cockrum must establish not only that the failure of his attorneys to investigate was unreasonable but also that the failure to present the evidence that could have been discovered would have been objectively unreasonable.

tive standard of reasonableness, Cockrum must show that his counsels' errors deprived him of a fair trial. *See United States v. Cronic,* 466 U.S. 648, 658, 104 S.Ct. 2039, 2046, 80 L.Ed.2d 657 (1984) ("Absent some effect of challenged conduct on the reliability of the trial process, the Sixth Amendment guarantee is generally not implicated."). "The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland,* 466 U.S. at 694, 104 S.Ct. at 2068. "When a defendant challenges a death sentence ... the question is whether there is a reasonable probability that, absent the errors, the sentencer ... would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." *Id.* at 695, 104 S.Ct. at 2069. The prejudice test is not merely focused on outcome, however, but instead encompasses a consideration of whether the result of the proceeding was fundamentally unfair or unreliable. *Lockhart v. Fretwell,* 506 U.S. 364, 113 S.Ct. 838, 122 L.Ed.2d 180 (1993); *Armstead v. Scott,* 37 F.3d 202, 206–07 (5th Cir.1994), *cert. denied,* —— U.S. ——, 115 S.Ct. 1709, 131 L.Ed.2d 570 (1995); *see Strickland,* 466 U.S. at 696, 104 S.Ct. at 2069 ("[T]he ultimate focus of inquiry must be on the fundamental fairness of the proceeding whose result is being challenged."); *Nix v. Whiteside,* 475 U.S. 157, 175, 106 S.Ct. 988, 998, 89 L.Ed.2d 123 (1986) ("[A] defendant need not establish that the attorney's deficient performance more likely than not altered the outcome in order to establish prejudice under *Strickland.* ").

**b. Analysis**

Cockrum's defense team consisted of three persons. Two attorneys were appointed:

---

The above-quoted passage from *Strickland* does not suggest that this latter inquiry is part of the test for deficient performance, nor do the cases cited by the State in support of this proposition articulate such a rule. *See Kyles v. Whitley,* 5 F.3d 806, 819 (5th Cir.1993), *rev'd on other grounds,* —— U.S. ——, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995); *Wiley v. Puckett,* 969 F.2d 86, 100 (5th Cir.1992); *James v. Butler,* 827 F.2d

David Malaby, Esq., in July 1986, and Richard Shumaker, Esq., approximately six weeks later. An investigator, Chris Marbut, was appointed in late October. Jury selection began in early December and lasted roughly four days. The guilt-innocence phase took a little over a day, and the punishment phase lasted a few hours. At the time of Cockrum's trial, Malaby had been practicing law approximately five years, primarily as an assistant district attorney for Bowie County. Shumaker had been practicing about the same amount of time with a general practice of both civil and criminal cases. Cockrum's trial was Malaby's first capital murder case, while Shumaker had previously represented a defendant in a capital murder trial in Arkansas.

Cockrum's attorneys split the responsibility for Cockrum's trial between them—Shumaker was primarily responsible for the guilt-innocence phase, while Malaby was primarily responsible for the sentencing phase. *Transcript,* Feb. 22, 1996, at 8–9 (testimony of Rick Shumaker). This division was not absolute: both attorneys would interview Cockrum at the same time and discuss trial strategy together, and Malaby examined some witnesses during the guilt-innocence phase. Shumaker did not examine any witnesses or argue at the punishment phase, however, and it was Malaby who was in charge of the investigation: Shumaker testified that he was not actively involved in investigation, *id.* at 30, and Chris Marbut, the court-appointed investigator, testified that he dealt primarily with Malaby, *Deposition of Chris Marbut,* at 11. As a consequence, even though both attorneys shared the duty to provide effective assistance throughout the representation of their client, much of the inquiry for this claim focuses on the conduct of Malaby.

---

1006, 1015–17 (5th Cir.1987), *cert. denied,* 486 U.S. 1046, 108 S.Ct. 2044, 100 L.Ed.2d 628 (1988). The usefulness at trial of the information that could have been discovered is properly considered in the prejudice prong of the *Strickland* test, and an adoption of the State's proposal would collapse *Strickland's* two-part inquiry into one.

At the punishment phase of Cockrum's

At the punishment phase of Cockrum's trial, the jury was required to answer the following special issues:

(1) whether conduct of the defendant that caused the death of the deceased was committed deliberately and with the reasonable expectation that death of the deceased or another would result;

(2) whether there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society; and

(3) if raised by the evidence, whether the conduct of the defendant in killing the deceased was unreasonable in response to the provocation, if any, by the deceased.

Tex.Code Crim.P. art. 37.071 (amended).[20] The victim in this case was an unarmed, elderly woman who had been shot in the head at close range. Thus, the only legitimately contestable issue at the punishment phase was the second special issue—whether Cockrum would be a future danger to society.

The State put on four witnesses at the sentencing phase: a Bowie County probation officer, who testified that Cockrum had previous convictions for burglary of a building, attempted burglary of a habitation, and felony possession of marijuana; and three character witnesses, who all testified that Cockrum had a bad reputation in the community for being a peaceful and law-abiding citizen. *Statement of Facts*, at 1390–96. Cockrum

also put on four witnesses: a jailer, who testified that Cockrum had been a "good prisoner" in the roughly four months that Cockrum had been detained pending trial; and Cockrum's mother and two sisters, who all testified that Cockrum was loving and affectionate and that his life should be spared. *Id.* at 1396–1405.[21] In its deliberations, the jury could also consider all evidence introduced during the guilt-innocence phase, which, in light of the guilty verdict, established that Cockrum had committed an execution-style killing in the course of a robbery.

Several facts about the penalty phase investigation on Cockrum's behalf are not in dispute. Both attorneys testified that they knew that Cockrum had been using drugs at the time of his arrest, but that they did not question Cockrum, or anyone else, about his history of drug use. Cockrum's attorneys were also aware that when he was approximately seventeen years old, Cockrum had shot his father. From records at the Bowie County Sheriff's Office, Malaby learned that the police investigation labeled the shooting a justified homicide, and both attorneys testified that Cockrum was reluctant to discuss the subject of his father's death when they asked him about it. It is also uncontested that their investigation left them with less than a thorough understanding of these areas of Cockrum's background, and that they did not request a mental health examination of their client.[22]

---

20. The jury had to be in unanimous agreement in order to answer "yes" to any of these questions. Ten jurors had to agree in order to answer "no." In the event the jury deadlocked, a life sentence would be imposed.

21. An appendix to this opinion reproduces the testimony heard at the punishment phase, as well as the arguments of counsel.

22. The aspects of Cockrum's personal history that are at issue in this claim were briefly reviewed in connection with Cockrum's motion to withdraw his application. The opinion denying that motion provides a brief, but useful, summary of the type of information that Cockrum charges his attorneys' should have learned during their investigation for the punishment phase:

[Cockrum's] father was an alcoholic police officer who became violent when intoxicated, physically abusing the applicant, his sisters, and his mother. At a very early age—nine or

ten years old—the applicant began using illegal drugs and continued to do so until he was arrested on the charges for which he was ultimately sentenced to death. At the age of fifteen, he allegedly set fire to his school and was confined to a state correctional facility for boys. His family situation did not improve when he returned home at the age of sixteen. When the applicant was seventeen, he shot his father during one of his father's drunken, abusive episodes. A few weeks later, his father died of his wounds. Before he died, the applicant's father told authorities that the shooting was an accident; therefore, the applicant never faced criminal charges arising from the shooting. However, it is clear that the shooting had a profound impact on the applicant. His drug abuse escalated, and he attempted suicide at least twice. He married and had one daughter, but his marriage failed. Eventually, he became addicted to methamphetamines. During one episode of acute metham-

On several points relevant to the investigation and preparation for the penalty phase, conflicts in the testimony arose. Malaby testified that he met or talked frequently, almost weekly, with Cockrum's mother or other family members about Cockrum's case, and that he asked them to provide him with the names of potential character witnesses to be used at the punishment phase. *Transcript*, Feb. 20, 1996, at 169–73 (testimony of David Malaby). Cockrum's mother and sister, on the other hand, testified that other than one office meeting, a brief encounter after Cockrum's pretrial hearing, and a few telephone calls, they never had any contact with Malaby. *Transcript*, Feb. 22, 1996, at 74–75, 79–82 (testimony of Barbara Sutherland); *Transcript*, Feb. 21, 1996, at 155–60 (testimony of Becky Wharton). Further, Cockrum's mother testified that neither of Cockrum's attorneys explained that there might be a punishment phase or what a punishment phase was, much less asked her for names of potential witnesses who could provide favorable testimony at such a hearing. *Transcript*, Feb. 22, 1996, at 84–85 (testimony of Barbara Sutherland). According to Cockrum's mother and sister, most of their discussions with the defense concerned witnesses with some knowledge of the circumstances of the crime, not potential mitigation witnesses. *Id.* at 75–76 (testimony of Barbara Sutherland); *Transcript*, Feb. 21, 1996, at 160–61 (testimony of Becky Wharton).

Malaby also asserted that from a very early stage of his representation, he informed Cockrum's family members that their testimony would be necessary in the event a punishment phase were held, and he discussed the scope of their testimony with them. *Transcript*, Feb. 21, 1996, at 10–11 (testimony of David Malaby). To the contrary, Cockrum's mother and sister testified that Malaby did not ask them to testify until shortly before the punishment phase began, and that he never went over their testimony with them before they took the stand. *Transcript*, Feb. 22, 1996, at 83–84 (testimony of Barbara Sutherland); *Transcript*, Feb. 21, 1996, at 161–63 (testimony of Becky Wharton). Malaby claimed that Cockrum's mother and sister regarded the death of Cockrum's father as a "closed subject" that they did not want to discuss, *Transcript*, Feb. 20, 1996, at 180–81 (testimony of David Malaby); these witnesses did not recall being questioned in any detail about the circumstances of Cockrum's death and asserted that they would have fully answered any questions put to them. *Transcript*, Feb. 22, 1996, at 78 (testimony of Barbara Sutherland); *Transcript*, Feb. 21, 1996, at 164–65 (testimony of Becky Wharton).

Malaby's testimony did not conflict solely with Cockrum's family members. Malaby recalled that someone from the defense team spoke to J.R. O'Rear, who is a former employer of Cockrum's, about the potential of O'Rear's testifying at the punishment phase. *Transcript*, Feb. 20, 1996, at 184–85 (testimony of David Malaby). O'Rear says he was never contacted. *Deposition of J.R. O'Rear*, at 13. Malaby insisted that he did not know Cockrum was hospitalized on the day of his arrest from a drug overdose, *Transcript*, Feb. 21, 1996, at 55 (testimony of David Malaby), but his notes suggest that he did.[23]

phetamine intoxication, he allegedly murdered a convenience store clerk during a robbery—the crimes for which he has been sentenced to death.
*In re Cockrum*, 867 F.Supp. 484, 485 (E.D.Tex. 1994).

**23.** On the day of his arrest, Cockrum was taken to St. Michael Hospital for a drug overdose. *Second Amended Petition for Writ of Habeas Corpus*, app. O–13. Malaby's notes from a pretrial interview of his client, containing the notations, "St. Michael—Day of Arrest," "Blood Test on ▲ ?," and "Dr.? Receipt?," establish that Malaby knew at least that Cockrum had been hospitalized on the day of his arrest. *Applicant's Ex. 16G*. Despite this knowledge, Malaby did not take the obvious and readily available investigatory step of subpoenaing the records. Had they been subpoenaed, it would have been apparent that further investigation into Cockrum's medical history and mental health were warranted. The medical records record the following observations: "The patient was irrational and inappropriate. He was obviously withdrawing from amphetamines." *Second Amended Petition for Writ of Habeas Corpus*, app. O–13. Cockrum was diagnosed with "methamphetamine abuse with psychotic episode secondary to methamphetamine," and admitted to the psychiatric unit of another hospital. *Id.*

On all of these points of conflict, it is found that Malaby is not worthy of belief, and his general assertions that he pursued character witnesses in contemplation of a punishment-phase defense are rejected. Aside from Malaby's general demeanor on the witness stand—which impressed this court as not merely hampered by the long passage of time since the trial, but as genuinely lacking in credibility—the objective evidence available from the time of trial does not support Malaby's version of events. First, the extremely brief and general examination of Cockrum's family members at the punishment phase reflects a lack of preparation; after hearing Cockrum's mother testify at several hearings in connection with this action, this court is convinced that with little prompting, she could have added compelling detail to the short and nonspecific testimony given at trial. Second, Malaby's time sheets, prepared for submission to the trial judge for purposes of calculating attorneys' fees, note only one meeting with Cockrum's family. *Applicant's Ex. 16Q.* Finally, among the notes from the case file—which was the most persuasive evidence offered at the evidentiary hearing bearing on the scope and extent of pretrial investigation by Cockrum's attorneys—only one page, containing a bare list of the witnesses who testified and an outline of Malaby's closing argument, contains any information relevant to the punishment phase. *Applicant's Exhibit 15–46.* The rest of the notes, primarily taken during interviews with Cockrum, focus either on evidence relevant to the guilt-innocence phase of trial—*e.g.,* Cockrum's whereabouts at the time of the crime, Cockrum's explanations for the large sum of money he possessed at the time of his arrest, lists of potential alibi witnesses, etc.— or matters such as jury selection and the change of venue motion. *See Applicant's Ex. 15–1 to 15–90, 16A–16Q & 17.* It is recognized that Cockrum's attorneys did not record every single conversation with a potential witness or every thought about trial strategy, but had some meaningful effort been put into the investigation and preparation of the punishment phase, the case file would surely contain some hint that such an effort had been made.

Malaby testified that he asked Cockrum and Cockrum's mother for the names of potential character witnesses, that he investigated the few names that he was given, and that he gave up the search after he was unable to locate anyone with anything favorable to say about his client. *Transcript,* Feb. 20, 1996, at 166–67 (testimony of David Malaby). However, it is implausible that Cockrum would have not given at least the name of his long-time employer, J.R. O'Rear, who was never contacted by a member of the defense team, and it is clear that if she had been asked, Cockrum's mother would have readily directed Cockrum's attorneys not only to O'Rear, but also to Oglesby, Blackburn, and a number of others with favorable opinions of Cockrum, none of whom were approached about their testimony,*Transcript,* Feb. 22, 1996, at 115–19 (testimony of Barbara Sutherland). It is found that prior to the time that Cockrum's jailer was subpoenaed in the middle of jury selection, *Applicant's Ex. 17,* Cockrum's attorneys made no attempt to locate witnesses to testify at the punishment phase or to investigate mitigating evidence to present on their client's behalf. Furthermore, based on the documentary evidence submitted, as well as the testimony heard at the evidentiary hearing, it is found that the failure to investigate punishment evidence in this case was based not on a reasoned decision to cut off the investigation; rather, it was the result of a simple lack of effort.

Even if the court were persuaded that the lack of investigation for the penalty phase was the result of a conscious decision on the part of Cockrum's attorneys, the reasons offered for limiting their investigation into potential punishment-phase evidence were not reasonable under the circumstances of this case. Both attorneys asserted that the failure to investigate Cockrum's history of drug use was based on a concern that the mere mention of drugs to the jury would irreparably prejudice their client, *Transcript,* Feb. 22, 1996, at 32–34 (testimony of Rick Shumaker); *Transcript,* Feb. 21, 1996, at 32–33 (testimony of David Malaby), and a related concern that any favorable evidence they could put on in this area would "open the door" to the State's putting on more damag-

ing evidence about Cockrum's past, *Transcript,* Feb. 21, 1996, at 41 (testimony of David Malaby). Similarly, Malaby testified that he feared that introducing the circumstances of Cockrum's father's death would open the door for the State to introduce prior violent acts committed by Cockrum. *Transcript,* Feb. 20, 1996, at 179 (testimony of David Malaby); *see also Transcript,* Feb. 21, 1996, at 27–28, 53–54 (testimony of David Malaby). It is apparent, however, that these reasons were developed as part of a strategy for the guilt-innocence phase of trial and that no strategy at all was developed for the punishment phase. In this regard, the following exchange from the evidentiary hearing is illuminating:

Q. ... Since you decided you didn't want anything in the trial about drug usage or abuse, that led you not to conduct an investigation independent of Mr. Cockrum, of his history of drug abuse; is that right?

A. That's correct.

Q. Now, why is it that you were so fearful of anything about drug abuse coming into this trial?

A. In trying cases in Bowie County and seeing how Bowie County jurors and jurors in our area reacted to it, we felt like once we opened the door for drugs, that we would taint the jury; and any hope that we had for anything, would be out the door.

Q. Now, is it just the mere mention of drug use that could do that?

A. In our locale it is.

Q. So if anything happened to slip out in trial—I mean you knew that this was a drug community that Johnny Cockrum was associated with at the time, didn't you?

A. Yes.

Q. You knew he had at least had some history of drug usage? In fact, you knew that he had—before trial he got a felon in possession of marijuana conviction, didn't he?

A. Yes.

Q. You knew that was going to come in the penalty phase?

A. We knew it was coming in the penalty phase. We didn't want it in guilt/innocence.

Q. But you knew at least in the penalty phase there was going to be some evidence of Johnny Cockrum being connected to drugs?

A. I knew in the penalty phase. I wanted to keep it out in guilt/innocence phase, because if we had any chance whatsoever of him being found not guilty of capital murder it was out the door if drugs came in, in my opinion.

. . . .

Q. Now, since you knew that in the penalty phase something was going to come out connecting him to drugs, there was going to be a conviction for felon in possession of marijuana, your thinking needed to be a little different about the penalty phase, didn't it?

A. Well, like I say, I was worried about the guilt/innocence stage. I was leaving that up to David [Malaby] as to how he was handling that. I didn't know how he was going to handle it. That was his preparation. But we talked about it. We made the decision to try and keep anything out about drugs in the guilt/innocence stage.

*Transcript,* at 31–34 (testimony of Rick Shumaker).

In addition to the near certainty that Cockrum's prior drug conviction would be put in evidence at the punishment phase, the State could have put on evidence of unadjudicated bad acts no matter what evidence Cockrum introduced. *See, e.g., Smith v. State,* 676 S.W.2d 379, 390 (Tex.Crim.App. 1984) ("It has been consistently held that evidence of unadjudicated extraneous offenses are admissible at the penalty phase of a capital murder trial absent showing of unfair prejudice."), *cert. denied,* 471 U.S. 1061, 105 S.Ct. 2173, 85 L.Ed.2d 490 (1985); *see also Motley v. Collins,* 18 F.3d 1223, 1227 (5th Cir.1994), *cert. denied,* —— U.S. ——, 115 S.Ct. 418, 130 L.Ed.2d 333 (1995). Simply put, there was no door to open at the punishment phase, and a decision not to investigate punishment phase evidence predi-

cated on this misunderstanding of the law would be unreasonable. In any event, it is apparent that Cockrum's attorneys never made this decision, but instead focused their investigation solely on the harmful implications of this evidence for the guilt-innocence phase without any thought as to how this evidence might or might not be used at the penalty phase. As Cockrum puts it in his post-hearing brief, "Because they did not prepare for or conduct any penalty phase investigation, the guilt phase strategy became, by default and not design, their strategy for the penalty phase." *Applicant's Post-Hearing Brief,* at 35.

Cockrum's jailer was subpoenaed a few days before he testified, and Cockrum's mother and sisters were asked to testify no more than a few hours before they took the stand. The trial record, the documentary evidence submitted, and the credible testimony heard at the evidentiary hearing establish that Cockrum's attorneys put no more thought, investigation, or preparation into the punishment phase of their client's trial than that. It is found that the near total lack of preparation by Cockrum's attorneys for the punishment phase fell below an objective standard of reasonableness.

A reasonably competent investigation in preparation for a punishment phase in this case would have produced a wealth of readily available information about Cockrum's family background and medical history. Had she been asked, Cockrum's mother could have provided valuable insight into her deceased husband's increasing problems with alcohol and his periods of violence toward his family, the complex relationship between Cockrum and his father, and the profound impact of his father's death on Cockrum's behavior, *Deposition of Barbara Sutherhand,* Dec. 12, 1995, at 31–39; *Transcript,* Feb. 22, 1996, at 89–91 (testimony of Barbara Sutherland); she could have informed Cockrum's attorneys about her son's long history of hospitalization, *Transcript,* Feb. 22, 1996, at 93–95 (testimony of Barbara Sutherland); and she could have provided a list of persons who thought highly of Cockrum and who would have made excellent mitigation witnesses, including Miledge Oglesby, John Blackburn,

and J.R. O'Rear. *See id.* at 115–19 (testimony of Barbara Sutherland). Had Cockrum's medical and institutional records been subpoenaed, they would have revealed a period of institutionalization at the Texas Youth Commission's Gatesville State School for Boys, *Second Amended Petition for Writ of Habeas Corpus,* app. O–2, a long history of severe drug abuse, *id.* app. O–4, several suicide attempts, *id.* app. O–6; *id.* app. O–8, and several psychotic episodes, including one in which a twenty-five-year-old Cockrum thought that he was seventeen years old again and that his father was still alive, *id.* app. O–11. If a mental health examination had been conducted, Cockrum could have been diagnosed with post-traumatic stress disorder, antisocial personality disorder, polysubstance abuse, and dysthymia (long-term depression), all with their roots in Cockrum's shooting of his father. *Transcript,* Feb. 20, 1996, at 22 (testimony of Jack Randal Price, Ph.D.).

■ Although it is clear that Cockrum's attorneys provided deficient performance at the punishment phase by failing to conduct any meaningful investigation, the more difficult question posed by this claim is whether counsels' deficiencies prejudiced Cockrum. The State did not, as it could have, put on evidence of unadjudicated conduct from Cockrum's past, and much of the evidence that Cockrum's attorneys could have learned possesses both aggravating and mitigating characteristics. It is thus difficult to hypothesize, in this case, what a penalty phase defense would have looked like after a reasonable investigation, much less how a jury would have reacted to it. This evidence could form the basis of a persuasive case that (1) explained why Cockrum was violent—*i.e.,* the enduring mental health consequences of his father's killing that led to a deepening cycle of drug abuse, suicide attempts, and violence; (2) identified his potential for responsible behavior and his capacity for forming close relationships with others—*i.e.,* his long period of employment with J.R. O'Rear, the high opinion that O'Rear, Miledge Oglesby, and John Blackburn had of Cockrum despite knowledge of his failings, and the close ties Cockrum maintained with his mother and sisters; and (3) demonstrated why, if

given a life sentence, Cockrum could be rehabilitated—*i.e.*, the crippling drug addiction and the mental diseases from which he suffered could be alleviated through the professional treatment available in the prison system and the support of his family. On the other hand, it would be nonsense to contend that a jury could not find a person with a long history of severe drug abuse, a diagnosis of antisocial personality disorder, and an extensive criminal record culminating in a cold-blooded murder to be a continuing threat to society. Case law in this area does not resolve the difficulty: although it is clear that counsel's decision to forgo the presentation of "double-edged" evidence at the punishment phase is a reasonable strategic choice, and hence not professionally deficient, *e.g.*, *Mann v. Scott*, 41 F.3d 968, 983–84 (5th Cir.1994), *cert. denied*, —— U.S. ——, 115 S.Ct. 1977, 131 L.Ed.2d 865 (1995); *Sawyers v. Collins*, 986 F.2d 1493, 1505–06 (5th Cir.), *cert. denied*, 508 U.S. 933, 113 S.Ct. 2405, 124 L.Ed.2d 300 (1993); it is unclear what prejudice results from counsels' wholesale failure, in the first instance, to balance the aggravating and mitigating aspects of such evidence.

This difficulty is compounded by a genuine uncertainty over whether Cockrum himself would have opposed a mitigation defense that relied on his father's death as a partial explanation for his behavior. At the time of his trial, Cockrum was reluctant to discuss his father's killing, as doubtless any person would be. In connection with this action, Cockrum sought, for a period of time, to waive further review of his conviction and sentence, primarily because he felt that his then-habeas counsel were misrepresenting the extent of the abuse he and his family suffered at the hands of his father and the precise circumstances surrounding his father's shooting. *See In re Cockrum*, 867 F.Supp. 484, 488–91 (E.D.Tex.1994). At the evidentiary hearing, Cockrum could not say

one way or the other whether he would have opposed the presentation of such evidence.[24]

Reconstructing a penalty phase without the errors of counsel in this case is, to a certain extent, an exercise in guesswork. This much, however, can be said: Had Cockrum's attorneys conducted a reasonable investigation in preparation for the punishment phase of trial, they would have learned a great deal of information about Cockrum's social history and family background, his long-term drug abuse, and the psychological consequences of his father's death. Had they had this information, Cockrum's attorneys could have presented a significantly stronger defense at the punishment phase of trial than was actually presented. Had this case been made, Cockrum's chances for obtaining a life sentence would have been significantly enhanced, and there is a reasonable probability—understood as "a probability sufficient to undermine confidence in the outcome"—that a jury would not have concluded unanimously, beyond a reasonable doubt, that Cockrum posed a continuing threat to society. *Strickland*, 466 U.S. at 694, 104 S.Ct. at 2068.

It should also be kept in mind that "[t]he benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Id.* at 686, 104 S.Ct. at 2063. The difficulty in recasting Cockrum's trial with the effective assistance of counsel is largely traceable to the near complete failure of Cockrum's attorneys to adequately prepare a defense and to make the hard choices over whether the mitigating potential of Cockrum's background outweighs its aggravating aspects. It little overstates the case to say that Cockrum was essentially abandoned at the punishment phase of his trial, and it is concluded that the punishment phase was rendered fun-

---

24. The applicant was asked whether he would have tried to prevent his trial attorneys from introducing any of the evidence presented at the evidentiary hearing, if they had developed it in 1986. He answered as follows:

Well, God's Word states that if a person is in Christ they are a new creation and all things are passed away and behold all things are new;

and I gave my life to Christ five years ago and have been born again, so I can't answer that one way or another as to what I would have done ten years ago. It wouldn't be a completely honest answer.

*Transcript*, at 121–22 (testimony of John Cockrum).

damentally unfair by the breakdown in the adversary process occasioned by the failure of his counsel meaningfully to investigate or prepare. Because of this fundamental unfairness, and because there exists a reasonable probability of a different sentencing outcome, it is found that Cockrum has satisfied the prejudice prong of the *Strickland* test.

## VI. *Analysis Under Antiterrorism and Effective Death Penalty Act*

As discussed above, *supra* Part III, because of the uncertainty surrounding the retroactivity of the AEDPA, the effect of the new law on this case is addressed in the alternative. Giving consideration to the foregoing analysis of Cockrum's application under prior law, which concludes that all but one claim is without merit, only the ineffective assistance claim need be addressed here. Whatever changes the AEDPA may make to the collateral review of state convictions, it is nowhere suggested that the AEDPA breathes life into claims that would be denied under prior law.

### A. Evidentiary Hearing

■ In a change from the prior statute, which was silent on the subject, the AEDPA identifies the circumstances in which an applicant is entitled to an evidentiary hearing in federal court:

If the applicant has failed to develop the factual basis of a claim in State court proceedings, the court shall not hold an evidentiary hearing on the claim unless the applicant shows that—

(A) the claim relies on—

(i) a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable; or

(ii) a factual predicate that could not have been previously discovered through the exercise of due diligence; and

(B) the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense.

AEDPA, § 104 (to be codified at 28 U.S.C. § 2254(e)(2)).

■ In a previous order, applying prior law, it was determined that an evidentiary hearing should be held, *Memorandum Opinion and Order,* Nov. 15, 1995, at 6, and the hearing was actually held several months before the AEDPA was enacted. The State argues that the evidence from the hearing must now be disregarded because under the newly amended version of § 2254, Cockrum would not be entitled to an evidentiary hearing. However, "when a procedural matter has been properly decided under the old rule, and a new procedural rule is subsequently enacted while the ultimate resolution of the case is still pending," the new provision does not apply. *Shipes v. Trinity Indus.,* 31 F.3d 347, 349 (5th Cir.1994); *see Landgraf,* 511 U.S. at —— n. 29, 114 S.Ct. at 1502 n. 29 ("[T]he mere fact that a new rule is procedural does not mean that it applies to every pending case."). Thus, even if the AEDPA were retroactive and assuming it would bar a federal evidentiary hearing in this case, the AEDPA does not undo the previous ruling that an evidentiary hearing should be held, nor require evidence already received in such a hearing to be disregarded. For these reasons, the State's contention that the AEDPA does not allow consideration of the evidence heard at the evidentiary hearing in this action is rejected.

### B. Presumption of Correctness of State Court Factfindings

■ With respect to the deference accorded a state court's factfindings, the AEDPA amends § 2254 by eliminating the eight enumerated reasons for setting aside the presumption of correctness and specifying that a state court's factual finding may be disregarded only if the presumption is overcome by clear and convincing evidence:

In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct. The applicant

shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.

AEDPA, § 104 (to be codified at 28 U.S.C. § 2254(e)(1)). Thus, the *ex parte* contacts between the state judge and the State's attorney, and the conclusion that Cockrum did not receive a fair hearing at the state habeas level, do not justify setting aside the presumption of correctness under the AEDPA. *Cf.* *supra* Part IV(D) (setting aside presumption of correctness on this basis pursuant to former § 2254(d)(2), (6) & (7)). Instead, the state court's factfindings must be examined in light of the evidence introduced at the evidentiary hearing for clear and convincing error.

The state habeas court made the following findings regarding the ineffective assistance claim:

> Attorneys David Malaby and Rick Shumaker provided effective assistance at the punishment phase of the trial.

> Defense Counsels presented mitigating evidence at the punishment phase.

> Defense Counsels were not ineffective for failing to develop and present evidence of insanity because the defendant was competent prior to and during trial and their investigation and objections reasonably indicated that there was no evidence of incompetency or insanity.

> Physical and psychological evidence are presented for the first time on habeas corpus by applicant. Evidence of physical and psychological abuse, drug abuse, and voluntary intoxication does not rise to the level of *Penry* mitigating evidence. Defense Counsels were not ineffective for failing to present such evidence. Counsels' decision not to use such evidence due to the fact it would open the door to more harmful evidence, amounted to trial strategy.

*Findings of Fact and Conclusions of Law,* ¶¶ 25–28.

▮▮▮ "Although state court findings of fact made in the course of deciding an inef-

fectiveness claim are subject to the deference requirement of § 2254(d), ... both the performance and prejudice components of the ineffectiveness inquiry are mixed questions of law and fact" that are not subject to the presumption of correctness.[25] *Strickland v. Washington,* 466 U.S. 668, 698, 104 S.Ct. 2052, 2070, 80 L.Ed.2d 674 (1984); *Motley,* 18 F.3d at 1226. Separating legal conclusion from historical fact, it is apparent that the following factual findings underlie the state court's disposition of this claim: Cockrum's attorneys conducted an investigation into Cockrum's life history and made an informed decision not to put on any evidence about his background at the punishment phase of trial. In light of the clear and convincing evidence introduced at the federal evidentiary hearing, it is found that these findings of fact are erroneous. As discussed above, *supra* Part V(D)(3)(b), it is apparent, clearly and convincingly so, that Cockrum's attorneys conducted no meaningful investigation into penalty-phase evidence and that this failure to investigate was not the result of an informed, tactical decision.

This finding is relevant also to the analysis of Cockrum's claims under pre-AEDPA law. *See supra* note 8 (noting that the clear and convincing evidence standard is the same under the old and new habeas corpus statute). Although it has been found that, under former § 2254(d) the presumption should be set aside because of the *ex parte* contacts at the state habeas level, it is found in the alternative that with respect to the factfindings underlying the state court's disposition of the ineffective assistance of counsel claim, Cockrum has rebutted the presumption of correctness. With respect to all other factfindings by the state habeas court relevant to the claims for relief in this opinion, however, Cockrum has not produced clear and convincing evidence that the state court's findings of fact are erroneous.

## C. Standard of Review

The AEDPA amends § 2254 by specifying the conditions under which an application for the writ of habeas corpus may be granted:

---

25. The quoted passage obviously refers to § 2254 prior to its amendment by the AEDPA; however, this statement is still good law to the extent it

identifies what findings are subject to the presumption of correctness in an ineffective assistance claim.

(d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

AEDPA, § 104 (to be codified at 28 U.S.C. § 2254(d)).[26]

Although this provision has no direct antecedent in the prior statute, subsection (d)(2) is analogous to former § 2254(d)(8), which provides that a federal court must defer to a state court finding of fact as long as the finding is "fairly supported" by the record of the state court hearing. *Cf. Marshall v. Lonberger*, 459 U.S. 422, 432, 103 S.Ct. 843, 849, 74 L.Ed.2d 646 (1983) ("This deference requires that a federal habeas court more than simply disagree with the state court before rejecting its factual determinations. Instead, it must conclude that the state court's findings lacked even 'fair support' in the record."). Using this previous test as a guide, it is found that the state court's disposition of the ineffectiveness claim was not "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."[27]

The first subsection, however—allowing relief only when the state court's "decision ... was contrary to, or involved an unreasonable application of, clearly established Federal law"—is not expressly limited to a review of the state court record. Furthermore, based on a consideration of the evidence received at the evidentiary hearing, taking into account the newly amended presumption of correctness provision, it has been found that the relevant facts underlying the state court's resolution of this claim are clearly and convincingly erroneous. It follows that the state court's disposition of the ineffective assistance claim—which concluded that Cockrum's attorneys provided effective assistance in part because the failure to introduce information from Cockrum's past "amounted to trial strategy"—"resulted in a decision that ... involved an unreasonable application of clearly established Federal law, as determined by the Supreme Court of the United States" in *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). 28 U.S.C. § 2254(d)(1) (emphasis added). Thus, it is concluded that under the AEDPA, Cockrum would be entitled to relief on his ineffective assistance of counsel claim.

## VII. Conclusion

During the punishment phase of his capital murder trial, John Cockrum was denied the

---

**26.** In a cogently argued reply brief, Cockrum raises multiple constitutional challenges to an interpretation of this provision that would require a federal court to defer to a state court's interpretation of federal law, and also argues that § 2254(d)(1) should not apply in this case because Cockrum's claims were not "adjudicated" within the meaning of that section. *Applicant's Response to Respondent Johnson's Supplement Brief*, at 32–46. It is unwise to address these constitutional concerns in an alternative holding, and it is unnecessary to reach the meaning of the term "adjudicated," since it is found that the applicant is entitled to relief under the AEDPA under the circumstances of this case.

**27.** Malaby and Shumaker executed identical affidavits, which were submitted with the State's response to Cockrum's state habeas petition. In relevant part, these affidavits state:

> After extensive and numerous discussions with Johnny Cockrum about his family history, trou-

bled childhood, drug abuse, and psychological history, and a lengthy investigation into these areas, my co-counsel and I determined not to present the facts concerning these areas to the jury as part of our trial strategy. Presenting these facts would have opened the door for the State to present evidence of other acts of violence—such as the fact that Johnny Cockrum, shot his father even though he was never indicted for it. We felt this fact would hurt his chance to avoid the death penalty more than the other information would help him to avoid it.

*Response to Petitioner's Application for Writ of Habeas Corpus*, Ex. G, ¶ 9 (Affidavit of David Malaby); *id.*, Ex. H, ¶ 9 (Affidavit of Rick Shumaker). These affidavits provide fair support for the findings of fact underlying the denial of the ineffectiveness claim by the state court.

## 1452

effective assistance of counsel, guaranteed by the Sixth Amendment. It is therefore found that he is held in custody by the State of Texas in violation of the federal Constitution, and that he is entitled to the writ of habeas corpus. The writ will issue conditionally. Unless, within ninety days from the date this order becomes final, the sentence of death by lethal injection in Cause Number 86–F–144–5 in the District Court of Bowie County, 5th Judicial District of Texas, is vacated and a new punishment hearing is initiated, then the applicant shall be released from custody. No constitutional error is found in the guilt-innocence phase of Cockrum's trial, however, nor in his conviction for capital murder. The writ is therefore not conditioned on the initiation of a new trial on the question of Cockrum's guilt or innocence, or on the conviction in Cause Number 86–F–144–5 being set aside. An order incorporating the adjudications herein set forth shall be issued simultaneously with the issuance of this memorandum opinion.

### APPENDIX

**Transcript of Punishment Phase in *State v. Cockrum***

*Statement of Facts,* at 1390–1419.

#### State's Evidence

#### Testimony of Harlan Jones

Q. State your name, please sir?

A. Harlan Jones.

Q. How are you employed?

A. I am an Adult Probation Officer with Bowie County.

Q. And how long have you been so employed?

A. A little over eight (8) years.

Q. What does an Adult Probation Officer do?

A. Responsible for the supervision of persons placed on probation by the District Courts of this County and of this State for both felony and misdemeanor offenses.

Q. And with regard to a felony offense, what distinguishes that from a misdemeanor offense?

A. A felony offense is one that is punishable by time in the Texas Department of Corrections.

Q. And just generally speaking, very compactly if you can, what is probation?

A. It is an alternative to incarceration where the person actually serves his sentence, although he serves it on the street under the supervision of the Court.

Q. And in essence it's a second chance?

A. Yes, sir.

Q. And when you say, "serve it on the street", the person actually resides in their home, and . . .?

A. . . . yes, sir, that's right.

Q. Do you know John Cockrum?

A. Yes, sir, I do.

Q. Do you know John Cockrum seated right here?

A. Yes, sir, I do.

Q. Do you know if John Cockrum has ever been convicted of a felony offense in the State of Texas?

A. Yes, sir, I do.

Q. Will you tell the Court and jury about that, please sir?

A. We first received Mr. Cockrum on probation in 1981 from Morris County, Texas. Although probation was granted in 1979, the offense was for burglary of a building. The next time . . . that sentence was subsequently dismissed in September of 1981. The next time we had Mr. Cockrum was in January of 1985, he was placed on probation in Dallas County, Texas, for attempted burglary of a habitation. That sentence is still running and is active at this time. In . . . I can't recall the month . . . it's been in the last two or three months, he pled guilty to the offense of felony possession of marijuana in Bowie County, and I believe received a three (3) year sentence in the Department of Corrections.

Q. We pass the witness, Your Honor.

#### Cross Examination

Q. Mr. Jones, just one question, the last offense you referred to, those proceedings took place while Mr. Cockrum was in jail for this offense, is that correct?

A. That's right.

Q. Thank you.

### Testimony of Thomas Hodge

Q. You are the same Thomas Hodge who was previously sworn and testified in this case, are you not?

A. Yes, sir.

Q. With regard to John Cockrum, are you familiar with the reputation of John Cockrum in the community in which he lives for being a peaceful and law abiding citizen?

A. Yes, I am.

Q. Is that reputation good, or is that reputation bad?

A. It's bad.

### Testimony of George Huggins

Q. You are the same George Huggins that was previously sworn and testified in this trial, are you not?

A. Yes, sir.

Q. And I believe you told us at that time that you are a Bowie County Sheriff's Deputy?

A. Yes, sir.

Q. Prior to being the Bowie County Sheriff's Deputy, did you hold any other position in law enforcement?

A. I worked nights, Dekalb.

Q. And are you familiar with the reputation of John Cockrum in the community in which he lives for being a peaceful and law abiding citizen?

A. Yes, sir.

Q. Is that reputation good, or is that reputation bad?

A. Bad, sir.

### Testimony of Carey Pinkham

Q. State your name, please sir?

A. Carey Pinkham.

Q. How are you employed?

A. New Boston Police Department.

Q. How long have you been so employed?

A. Almost fifteen (15) years.

Q. Let me ask you this, how long have you known John Cockrum?

A. Since the day that he was a small boy.

Q. Are you familiar with the reputation ... his reputation for being a peaceful and law abiding citizen in the community in which he lives?

A. Yes.

Q. Is that reputation good, or is that reputation bad?

A. It's bad.

### *Defendant's Evidence*
### Testimony of Wayne Green

Q. State your name, please?

A. Charles Wayne Green.

Q. Mr. Green, where do you live?

A. On Route 15, Box 528, Texarkana, Texas.

Q. And how are you employed?

A. Arkansas Department of Corrections.

Q. And are you on duty right now?

A. Yes, sir.

Q. And did we have to call you off duty to come down here?

A. Yes, sir.

Q. In what capacity do you serve for the Arkansas Department of Corrections?

A. I work in the Detention Center in the Jail.

Q. Alright, which jail?

A. Bi–State Justice Building.

Q. You don't actually work in the prison, do you?

A. I work for the prison facility, but I work in the Jail for Texarkana, Texas and Arkansas.

Q. Then it's true the Arkansas Department of Corrections actually runs the Bi–State Criminal Justice Center Jail in Texarkana?

A. Yes, sir.

Q. How long have you served in that capacity?

A. A little over a year now.

Q. While serving in that capacity, have you had the opportunity to deal with a young man named John Cockrum?

A. Yes, sir, I have.

Q. Do you see him in the Courtroom today?

A. Now I do.

Q. Behind me here at the counsel table. Can you tell this jury, have you dealt with him often?

A. Well, ever since he's been incarcerated, I have.

Q. How often?

A. On a regular daily basis.

Q. How many times a day would you say you dealt with him?

A. About every hour just about.

Q. How long has he been in the Bi–State Justice Center Jail?

A. I really don't know, but approximately three or four months. I don't know the exact date he was incarcerated.

Q. In dealing with Mr. Cockrum, do you take him out of his cell?

A. Yes, sir, I have.

Q. You handled him yourself?

A. Back and forth to visitation and such as that.

Q. When you deal with Mr. Cockrum, is it you and him, one on one sometimes?

A. Yes, it has been.

Q. Has he ever been violent with you?

A. No, sir, none whatsoever.

Q. Has he been a good prisoner as far as prisoners go?

A. To myself personally, yes, he has.

Q. Thank you, Mr. Green.

### Cross Examination

Q. Mr. Green, do you know about the criminal record of Johnny Cockrum?

A. No, I don't.

Q. You don't really know about his past, do you?

A. No, sir.

Q. Do you know about his reputation in the community in which he lives?

A. No, sir, I do not.

Q. Pass the witness, Your Honor.

### Testimony of Donna Chadwick

Q. State your name, please?

A. Donna Chadwick.

Q. Where do you live?

A. Greenville, Mississippi.

Q. How long have you lived there?

A. Since August of this year.

Q. Prior to moving to Mississippi, where did you live?

A. In New Boston, Texas.

Q. Do you know Johnny Cockrum?

A. Yes, sir.

Q. How do you know him?

A. He's my brother.

Q. Ms. Chadwick, you've been in the Courtroom and heard the proceedings, and you've heard the verdict of the jury, has Johnny been a good brother to you?

A. Yes.

Q. Is he a loving brother?

A. Yes, sir, he is.

Q. Have you ever known him to hurt you violently?

A. No, sir.

Q. Have you ever known him to be a bad person?

A. No, sir.

Q. Ms. Chadwick, are you testifying today to ask this jury to spare your brother's life?

A. Yes, sir.

Q. Thank you.

### Testimony of Becky Wharton

Q. State your name, please?

A. Becky Wharton.

Q. Ms. Wharton, where do you live?

A. New Boston.

Q. Do you know Johnny Cockrum?

A. Yes, sir.

Q. How do you know him?

A. He's my brother.

Q. Do you all have regular contact?

A. Yes, sir.

Q. How often?

A. Oh, as often as we can since he's been up there.

Q. Prior to the time he was put in jail, how often would you see Johnny?

A. Often ... weekly, every couple weeks.

Q. Could you call on him for help if you needed him?

A. I believe I could.

Q. Do you love your brother?

A. Yes, sir.

Q. Is he affectionate toward you?

A. Very affectionate.

Q. Is he a good brother to you?

A. Yes, sir, always.

Q. Are you asking this jury to spare his life?

A. Yes, I am.

Q. Thank you.

### Testimony of Barbara Southerland

Q. State your name, please?

A. Barbara Sutherland.

Q. Ms. Southerland, is it true you're Johnny Cockrum's mother?

A. Yes, I am.

Q. Where do you live?

A. New Boston.

Q. Has Johnny been a good son to you?

A. Yes, he has.

Q. Does he help you?

A. Yes.

Q. Do you feel like you can call on him for help if you need him?

A. Yes, I could.

Q. Have you done that in the past?

A. Yes.

Q. Has he been a source of support to you during previous times?

A. Yes, he has.

Q. Did you see him often before he was put in jail?

A. He was living with us.

Q. Did he help you around the house?

A. Yes. Yes.

Q. Does he show affection back to you more than normal, or average, how would you express it to the jury?

A. We're a very close family ... a very affectionate family.

Q. Do you talk to him alot [sic]?

A. Yes.

Q. Since he's been in jail, have you been able to see him?

A. On the average of twice a week at least.

Q. Is that through a glass window?

A. Yes, it is.

Q. Are you asking this jury to spare your son's life?

A. Yes, I am asking them that.

Q. Thank you, Ms. Southerland.

### State's Argument

First, I would like to thank you for your verdict. It was the only fair and just verdict that you could have reached based upon the evidence you heard.

Now, I would like to tell you that your job is done. I would like to tell you that you can go home, but that's not so. We are now in the punishment phase of this trial. Unlike most cases, you do not set punishment.

Mr. Malaby asked the witnesses here ... some of the witnesses, for you to spare his life. That is not a choice that you are going to make. You are not going to make a choice as to punishment to be handed down in this case. That's not your function. Each of you will recall, we spent time with you individually, and the Court instructed you in his general voir dire, and Mr. Elliott instructed you in the general voir dire, that it's your responsibility to answer questions. Based upon those questions, His Honor will take whatever action is appropriate.

Each of you promised that you could answer those questions, based upon the law and the evidence that you heard and that were presented to you in this trial, and I know you can.

Let me visit with you shortly about the questions you are getting ready to answer. As you well know, there are three questions. I will speak to you on the first and the third questions, and Mr. Elliott will speak to you on [the] second. As the Court's Charge tells you, this is Number 1, Do you find that the evidence, beyond a reasonable doubt, that the conduct of the Defendant, John Cockrum, caused the death of Eva May, was committed deliberately and with the reasonable expecta-

tion that the death of the deceased or another would result?

Ladies and Gentlemen, there are two things in that question that I think are important to you. No. 1, it mentions the term 'deliberately' and there is no definition here. The Court does not give you a definition for you to go back and look at it and determine what deliberately means. You use your common sense. Your everyday, practical experience, what life tells you deliberately is. Intentionally, knowingly, did he mean to do it, what it means to you, and you answer that question based upon that.

The second portion of that question is, with the reasonable expectation that the death of the deceased, Eva May, or another would result. You are not confined at this stage of the trial to just conclude your testimony or your decision on the evidence that you've heard in this punishment phase. Go back and look at the entire trial and the testimony.

If you will recall, the pathologist came in here and talked about his qualifications, and the man told you that Eva May was shot by a person from top to bottom, and a little bit from left to right. He also told you that there was strippling, and was shot from a distance of from six to twelve inches, approximately a foot. I think a reasonable deduction ... the only deduction to make, the person was shot in the head at a distance such as that, one would reasonably expect that death would result.

Now, Question 3, the Court instructs you, Do you find from the evidence beyond a reasonable doubt, if raised by the evidence, whether the conduct of the Defendant in killing the deceased was unreasonable in response to the provocation, if any, by the deceased.

Again, calling back your recollection to the testimony, Sheriff Hodge was the investigating officer. You saw the picture of the hands of Eva May. You remember Mr. Elliott asked, was there a weapon on the floor. I think if you will again consider the evidence, and you will determine that there was no provocation ... you can see strippling on the

hand, there was no provocation. That answer should also be 'yes.'

Ladies and Gentlemen, I know you are taking your job seriously, and your responsibility, and it's your duty to answer these questions based upon the law and the evidence, and I know that you can. Thank you.

### Defendant's Argument

It has been a long week. Everybody has put in alot [sic] of work on this case. We appreciate all of your consideration. We appreciate the time that you listened to the evidence, and the consideration that you gave to the case, but now comes the most important part of this trial. The toughest part is yet to come.

Now, we must respect your verdict. That's our system of justice. I can't deny that we're somewhat disappointed. When I decided to go to Law School, and I stood in front of the Court to be sworn in, I took my oath as a lawyer, I committed myself to our system of justice at that time. I stand committed to that system today, and I will continue to stand committed to our system.

Let me point out a few things. A few things that I want you to think about when you retire as a group again.

Think about the evidence that you've been provided with.

Now, the State will have the opportunity to get back up again, like they did on the first phase, so because we're not the last ones to speak, please don't forget what I'm going to say to you. Like we talked about when we brought each of you in here individually all during the week, one at a time, you were each advised of the three issues, and one at a time, you were each advised that the State's burden of proof is beyond a reasonable doubt on each and every one of those issues. And we took each one of you, one at a time and asked you, can you commit to us, can you commit to us before you would ever invoke a verdict which would cause the most harshest [sic] sentence in our world being imposed on this young man right here. Everyone of you committed that you would make the State bring you all the evidence you needed to say beyond a reasonable doubt that that should be the result.

Let's look at those issues briefly, Ladies and Gentleman, to see what you have to work with.

You'll get this Charge to take with you. Look at them, one at a time as a group, question each other. Question each other as to what basis of evidence you have to vote 'yes' on these issues.

Number 1, do you find from the evidence beyond a reasonable doubt that the conduct of the Defendant, John Cockrum, that caused the death of Eva May was committed deliberately and with the reasonable expectation that the death of the deceased or another would result?

Have they proved that beyond a reasonable doubt? You've got the testimony of Jerry Morgan. What else is there to support that? What else? Does that erase all reasonable doubt that will allow you to render that verdict and live with that verdict the rest of your life, knowing the consequences?

Number 2, do you find from the evidence beyond a reasonable doubt that there is a probability that the Defendant, John Cockrum, would commit criminal acts of violence that would constitute a continuing threat to society?

They showed you his record. No previous acts of violence. Nothing else, has this young man done that was violent towards anybody. Let's go further.

Number 3, do you find from the evidence beyond a reasonable doubt that if raised by the evidence, the conduct of the Defendant, John Cockrum, in killing the deceased was unreasonable in response to provocation, if any, by the deceased?

There's no evidence on that point, Ladies and Gentlemen. You're going to be required to assume some facts. You're going to be required to assume some facts, to get to that point beyond a reasonable doubt. That's [sic] don't square up.

What do we seek to achieve by our system of justice? That's a question that ought to bear heavy on these issues.

This young man can be punished by a sentence of life imprisonment, to live beyond [sic] bars to conduct every bit of his day to day activities in a cage, and in a society all to itself. How can he be a threat on society if he is locked up, behind bars in a sentence of life imprisonment? Ask yourself that.

Sometime back the Supreme Court re-established the death sentence for this Country. Every time our system of justice as a society invokes a punishment on one of our members ... fellow members of society, history is made ... the history of our society is made every time.

When rehabilitation is attempted our society is taking a step forward. We're making an attempt to improve our society, to show that we are a civilized people.

This young man is twenty-seven years old. He has a family that loves him. He can be rehabilitated. Does the death of a person justify intentional killing of another? What do we accomplish? What happens when that happens? What do we say as a society when we do that?

Ladies and Gentlemen, all throughout the course of this proceeding, I feel like you people have followed the law, and you have abided by the commitments that you have made to this Court under your oath. Each and everyone of you committed to me, committed to Mr. Shumaker, committed to this Defendant, John Cockrum, you committed to Mr. Elliott and the State, that before you would ever vote for any kind of punishment that would result in such extreme measures, you would make them prove it ... prove it has to be done ... prove that there is no other alternative, beyond a reasonable doubt ... beyond any reasonable doubt whatsoever.

He's a human being. Ladies and Gentlemen, his life is in your hands, and I trust and I hope that you will do the right and just and Christian thing. Thank you very much.

### State's Rebuttal Argument

I want to begin by addressing squarely, head on, eye to eye, the issues ... the questions just posed to you by Mr. Malaby. And I want to begin first with what he covered last.

He talked about rehabilitation. That's fine ... it's well, it's good ... we have rehabilitation. We have rehabilitation. It's called probation, and we routinely and regularly give people second chances, up to a point, and then there comes a point when we as a society, if we are indeed a civilized people can afford no more. How many second chances do we give. How many Eva May's do we suffer. How many times are we going to have to look at pools of blood and dead bodies, because people don't choose to behave. We weep, and we are sad about what has happened. If we are going to be sad for anybody, let us be sad for those who truly did not bring this on themselves. Eva May did not deserve to wind up laying in that pool of blood in her store. She didn't deserve to have her head shot a distance of six inches to a foot, with her hand, whatever it was doing, up here by her face, shielding her eyes from the fatal bullet, praying, begging, whatever, that's the difference between Eva May and John Cockrum.

John Cockrum put Eva May on that floor. John Cockrum put himself right here, and this is not the first time. He had a second chance out of Morris County, he had a second chance out of Dallas County. He was convicted of felony marijuana, and been found guilty of capital murder. Yes, we're civilized, and it's time for civilized people to say, 'enough' ... it's time for civilized people to recognize that one of the goals of punishment is deterrence. It's not that we just can't stand any more of this from John Cockrum, it is our way of saying to whoever out in society who is so predisposed, you will pay a price, a high price and a heavy penalty, so don't do criminal acts. You'll be made to pay. We fail if we're week [sic] on that point ... we fail, and not a little bit of what we do here quite frankly is to punish people for a bad act, just as you would spank a child for a bad act.

In that regard, ask yourself this. What's the nature of the crime that we have here? What is more serious than capital murder? How do you describe capital murder? In thinking how we would try to describe it to you, I can't put anything together, but several words pop to mind. Cruel, brutal, painful, cowardly, it goes on and on and on ... it's the bottom of the barrel. There is nothing worse. We've tried everything. We've suffered long enough. Let us protect ourselves. Let us protect society as this system of justice strives to do.

Question 1 and 3 have already really been answered, or we wouldn't be here. The act was intentional, it was deliberate. Mr. Raffaelli covered Question 1 and 3 very well. There is absolutely no provocation. None. There is no evidence of provocation. You saw the picture of Eva May's hand, did you see a weapon in her hand? Did you see any evidence that she threatened anyone? And what that really brings us to, is Question 2, and that's why we ask you, will you wait until you hear all of the evidence before you decide. If you were asked to decide that question immediately after rendering you[r] verdict of guilt or innocence, without hearing any evidence, you wouldn't know about the past of John Cockrum. You wouldn't be able to adequately and fairly judge him. You wouldn't know how many second chances he's been given, you wouldn't know how much society has suffered in order to try to rehabilitate John Cockrum. A second chance is a present, and what has he done with it? Thrown it in the dirt. He's said, this is not precious to me. My life is not precious to me. I will not pay the small price that society asks for each of our freedom. That is, I won't be responsible, I won't be ... I'm not going to obey the law, so he says by his actions.

Mr. Malaby asked you about previous acts of violence. That is not what the question says. The question addresses the future. The question says, do you find that there is a probability that the Defendant will commit criminal acts of violence. Not the same thing ... not capital murder ... but criminal acts of violence that would constitute a continuing threat to society. Let me give you a simple example of what I think this is telling us in a case like this. We don't mean to demean the seriousness of what we're doing here, and I hope I don't offend anybody by making this illustration, but let's say we were walking by a fence every day, and there was

a dog in the fence and the dog would growl at us. It never bit us before, but it growled at us, and we went inside the fence and our leg was severely mauled by the dog. The next day when we walked by, even though that dog has only committed one act of violence, just as John Cockrum has only committed one murder. Are we willing to go inside the fence with the dog? No. Your common sense tells you to stay out. Well, this is the problem that we've got. Are we willing to gamble? And that's what Mr. Malaby asks us to do when he says, spare John's life. He's saying, let's gamble. Let's take a chance. I can't make the death of Eva May any more horrible than it is. You've seen the picture and the picture speaks for itself.

You know, we predict the future everyday in our lives. If you are a loan officer in a bank, and a person came in to see you and asked for a loan, and that person has a bad credit history, what would you think the chances of that person paying that loan back in the future would be? If he didn't pay his loans before, why should he pay this loan in the future.

Someone with a bad work record. Let's say that you're a personnel manager, or a personnel administrator, and someone walks up and wishes to hire on, and he says here's my work record, and you've got absence, tardiness, laziness, fired from several jobs, what would you predict about that person in the future. Will he be a good employee or a bad employee?

If you were a designer or an engineer, and you were to build things and constantly be working with designs, and you know that there was one design that constantly failed, would you continue to use that design? No. You in essence predict the future based on past performance. What's so different about this?

Look at the capital murder. Look at the criminal record of John Cockrum, and you tell us and say by your verdict, yes, we're willing to gamble, we'll take one more chance, because there will be more Eva May's.

You told us that you would answer the questions according to the evidence ... you'd let the evidence speak to you ... you'd let the chips fall where they may.

If what you try to do if you get outside that is to forgive John Cockrum, I would urge you to forget that. You cannot forgive John Cockrum. The stain on his soul is like the blood on his hands, it will be there forever and you can't wash it off, and you shouldn't try.

What do we do? How much do we cry for the victim? How much do we mourn for Eva May, is she any less a human being? John Cockrum is a human being. Was Eva May any less a human being?

In answering these questions and considering the problem we have, let's draw ... let's draw on something that we all lean on. Let's draw on a quote from the Book of Amos. "Let Judgment run down like the waters, and righteousness like a might[y] stream." That's all we ask on behalf of Eva May, and every living, breathing, law abiding citizen that needs your protection. It is all dependent on you, because in the final analysis of you, each of you for the real protectors of our lives. Help us. Do your duty. Thank you.